TEXAS INSTRUMENTS INCORPORATED AND ITS CONSOLIDATED SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Texas Instruments v. Commissioner
Docket No. 32707-88
United States Tax Court
T.C. Memo 1992-306; 1992 Tax Ct. Memo LEXIS 328; 63 T.C.M. (CCH) 3070; May 27, 1992, Filed *328 Decision will be entered under Rule 155. John S. Nolan, Alexander Zakupowsky, Jr., Jean A. Pawlow, Robin L. Greenhouse, and Robert E. Liles, II, for petitioner. Deborah A. Butler, John S. Repsis, and Gary D. Kallevang, for respondent. COHEN
COHEN
TABLE OF CONTENTS Issue 1: Long-Term Contract and Overhead Adjustments FINDINGS OF FACT Background Overview of Petitioner's Accounting System Costs Allocated Through Petitioner's 4000 and 6000 Series Accounts Costs in Petitioner's 8000 Series Accounts Casualty Loss Profit in Asset Depreciation Purchase Cash Discounts Rework Labor and Scrap Tax Treatment OPINION Completed Contract Rules The Parties' Positions Expert Testimony Change in Method of Accounting Respondent's Adjustments to Overhead Variances Respondent's Affirmative Claim Casualty Loss PIA Depreciation Purchase Cash Discounts Rework Labor and Scrap Issue 2: Petitioner's Rebate Programs FINDINGS OF FACT Rebate History TI-59 Rebate Program The Home Computer Rebate Program The Learning Aids Rebate Program The Speech Synthesizer Rebate Program OPINION Issue 3: Investment Tax Credit Issue FINDINGS OF FACT Waste Treatment Facilities
Drywall Partitions
*329 Miscellaneous Structures and Related Equipment Floors Window Walls Ceilings Air Conditioning Plumbing Emergency Doors Fire Protection Systems Security Fencing Landscaping Electrical Equipment Category One Category Two Category Three Category Four OPINION Waste Treatment Facilities
Drywall Partitions Miscellaneous Structures and Related Equipment Floors Window Walls Ceilings Air Conditioning Plumbing Emergency Doors Fire Protection Systems Security Fencing Landscaping Electrical Equipment Category One Category Two Category Three Category Four MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $ 34,450,765, $ 172,714, and $ 39,777,526 in petitioner's Federal income tax for 1980, 1981, and 1982, respectively. In its petition, petitioner affirmatively asserted that it was entitled to overpayments of $ 2,530,408, $ 1,460,668, and $ 1,645,219 for 1980, 1981, and 1982, respectively. By Amendment to Answer, respondent set forth additional allegations to support respondent's claim that the correct deficiencies in petitioner's Federal income tax for 1980, 1981, and 1982 were $ 53,465,355, $ 2,099,681, and $ *330 53,221,461, respectively. The issues discussed in this opinion are: (1) Whether petitioner's treatment of certain indirect costs and overhead variances under the long-term contract method of accounting set forth in section 1.451-3, Income Tax Regs., was proper and whether petitioner is entitled to other related adjustments, (2) whether petitioner's treatment of its rebate programs under section 1.451-4, Income Tax Regs., was proper, and (3) whether certain property used in petitioner's manufacturing operations was "section 38 property" eligible for the investment tax credit. A fourth issue has been separated and disposed of by separate opinion filed this date. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Because the pretrial stipulation process in this case was not adequate, the Court suggested posttrial stipulation of agreed facts that could be incorporated in our opinion. Based on the evidence, which included 3,696 *331 pages of transcript and over 775 exhibits, the parties filed with the Court 188 pages covering over 410 joint proposed findings of fact with respect to the issues for decision in this opinion. The parties also requested in 79 pages of their briefs that we find an additional 320 facts. It is not reasonable to reproduce here all of the findings requested by the parties. We have therefore endeavored to set forth only those findings that are necessary to explain and to dispose of the issues for decision in this opinion. The other agreed facts are incorporated in our findings by this reference. For convenience, we have set forth below separately our findings of fact and opinion with respect to each issue. Texas Instruments Incorporated (petitioner) was a publicly held corporation organized under the laws of Delaware with its principal place of business in Dallas, Texas. Petitioner was an accrual method taxpayer that employed other specialized accounting methods in reporting various items of income and expenses for Federal income tax purposes. Petitioner timely filed consolidated Federal income tax returns (Forms 1120) for the taxable years ended December 31, 1980, December 31, *332 1981, and December 31, 1982. Issue 1: Long-Term Contract and Overhead Adjustments
FINDINGS OF FACT Background
Petitioner's Equipment Group division (EG) contracted to manufacture equipment for various departments of the United States Government and some foreign governments. Eighty to eighty-five percent of the EG's business, in terms of value, was long-term contracts, and a majority of those contracts (over 2,000) were with the United States Government. Prior to 1979, petitioner used the percentage of completion method of accounting for cost plus contracts and the accrual shipment method of accounting for fixed price contracts, with inventories valued at the lower of cost or replacement cost. In 1979, petitioner filed with respondent a Form 3115, Application for Change in Accounting Method, requesting permission to change its method of accounting for long-term contracts in the EG to the completed contract method. On January 4, 1980, respondent granted to petitioner permission to change to the completed contract method. Overview of Petitioner's Accounting System
Petitioner maintained a uniform chart of accounts for financial planning and reporting purposes *333 that was organized in the following nine major account groups or series: Series Number
Accounts
1000
Assets
2000
Liability and Stockholders Equity
3000
Revenue, Cost, and Adjustment
4000
Manufacturing Overhead
5000
Service Operations Expense
6000
Research and Engineering Overhead
7000
Marketing Expense
8000
General and Administrative
9000
Other Income and Deductions
Indirect costs were initially charged to the 4000, 5000, 6000, 7000, or 8000 series accounts, depending on the type of cost. Subsequent reclassifications were made to the initial account charges. Certain types of accounts, known as clearing accounts, were used to collect costs in one series and the costs were then charged to other accounts in other series to account for the use of a service or property. Petitioner charged direct labor and direct materials to its 1000 series accounts directly or through adjustments from other accounts. At the beginning of each year, the EG developed overhead application rates for the 4000 and 6000 series accounts. The purpose of those rates was to charge to petitioner's long-term contracts certain indirect costs (overhead) by reference to actual direct labor costs charged *334 to those contracts. Petitioner set its overhead application rates high to motivate its managers and because it was petitioner's policy not to overstate its inventory. To determine the overhead application rates, petitioner estimated the annual overhead costs expected to be incurred, aggregated the accounts into pools, and divided the expected dollars in each pool by the expected direct labor costs for that year. The total estimated costs of all the 4000 and 6000 pools were divided by the total of estimated direct manufacturing and engineering labor dollars, respectively, to derive the overhead application rates. Those rates were expressed as percentages. By application of the manufacturing overhead rate, each dollar incurred for direct manufacturing labor resulted in an automatic charge (debit) of manufacturing overhead (4000 series account) to the same 1000 series account as the manufacturing direct labor dollar was charged. Similarly, by application of the engineering overhead rate, each dollar incurred for direct engineering labor resulted in an automatic charge of engineering overhead (6000 series account) to the same 1000 series account as the engineering direct labor dollar *335 was charged. Thus, through the overhead rates, costs in accounts and cost centers in the manufacturing and engineering pools (4000 and 6000 series accounts, respectively) were applied to and became a part of the costs of long-term contracts with manufacturing and engineering direct labor hours. As each debit was made to a 1000 series account for application of the manufacturing and engineering overhead, a corresponding credit was made to account 4910 (manufacturing) or 6910 (engineering). This applied overhead was charged to project inventory and credited to accounts 4910 and 6910 at the standard overhead rates. Actual manufacturing and engineering overhead costs were charged to all other 4000 and 6000 series accounts, respectively. If the credit balances in its 4910 and 6910 accounts at the end of each year exceeded the aggregate debit balances in its various 4000 and 6000 series accounts, the EG had charged more overhead to the 1000 series accounts than it had actually incurred (overapplied overhead). Conversely, if the aggregate debit balances in its various 4000 and 6000 series accounts at the end of each year exceeded the credit balances in its 4910 and 6910 accounts, the *336 EG had actually incurred more overhead than it had charged to the 1000 series accounts (underapplied overhead). The overapplied and underapplied overhead were referred to as variances, because they represented the variance between estimated costs and actual costs. Underapplied overhead decreased petitioner's income, and overapplied overhead increased petitioner's income. The EG prepared journal entries each month in amounts equal to the net credit balances in its 4000 and 6000 series accounts and charged (debited) account 3931 (miscellaneous cost of sales) and credited account 1489 (inventory reserve account). The effect of these journal entries was to reserve in full all overapplied overhead without regard to the amount of overapplied overhead that should have been liquidated from inventories through cost of sales. In 1980, the EG had overapplied overhead. Thus, it increased its costs of sales by that amount as a debit to account 3931 and a credit to account 1489. As inventory was liquidated, the reserve account was relieved because the overhead charge was keyed by inventory. In 1981 and 1982, the EG had underapplied overhead and no adjustments were booked, because petitioner *337 did not want to overstate its inventories. The overapplied and underapplied balances as reflected in 4000 and 6000 series accounts for those years were: (Overapplied)/UnderApplied Balances
1980
1981
1982
4000 accounts
$ (5,100,101)
$ 1,234,451
$ 286,574 6000 accounts
4,541,802 3,956,578
(215,692)
Net
$ (  558,299)
$ 5,191,029
$   70,882 The total actual overhead for 1980, 1981, and 1982 was $ 213,510,032, $ 239,370,860, and $ 275,488,837, respectively. The variances expressed as a percentage of the total actual overhead for 1980, 1981, and 1982 were (.261), 2.169, and .026, respectively. Petitioner maintained organizational units called cost centers. Cost centers were an area of responsibility that contained accounts to collect the center's costs. Cost centers were groupings of employees that were segregated by resource type or organization. They were established for the management of particular functions or activities, which related to a "program" or "programs". The term "program" was used to refer to a particular contract or group of contracts. Certain 8000 series accounts for ad valorem, sales, and use taxes were charged to long-term contracts. *338 Also, some research and development costs were included in contract costs through applied overhead while other research and development projects were charged to cost centers that contained 8000 series accounts. Group occupancy charges, i.e., depreciation, utilities, lease costs, etc., were also collected in 8000 series accounts. These costs were accumulated in cost centers and charged out on a square-foot basis to the various cost centers using the facilities. This was accomplished by crediting account 8975 for these cost centers and debiting the appropriate account for the cost center to which the cost was charged. If charged to a cost center that contained accounts in the 4000 or 6000 series, the costs would be charged to account 4975 or 6975, respectively, and allocated to long- term contracts through the applied overhead rate. Costs Allocated Through Petitioner's 4000 and 6000 Series Accounts
Each cost center had managers and a clerical staff. There were typically one to three levels of management between cost centers and production workers. There were basically four levels of management within the EG (group, division, department, and supervisory). The group management *339 was the highest level of management within the EG. A cost center generally billed its activities to accounts in the 4000 or 6000 series, as appropriate. The costs in these cost centers were the foundation for the overhead application rates. The costs of other cost centers were contained in the 7000 and 8000 series accounts and were not charged to the 1000 series accounts, and the cost of other inventoriable overhead was collected in the 5000 series accounts. Some administrative cost centers performed management or administrative functions for the operation or support of program -- and project-type activities being conducted by the EG. Generally, where managers performed direct labor, their time was to be charged to 1000 series accounts and was not to be included in the balances of the cost centers. The administrative cost centers at issue had balances of $ 6,358,370, $ 6,690,883, and $ 7,665,578 for 1980, 1981, and 1982, respectively. Cost centers were established for cost accounting operations throughout the EG. Clerks performed a variety of cost accounting functions in each cost center. The cost accounting cost centers at issue had balances of $ 1,787,553, $ 2,487,109, *340 and $ 2,875,794 for 1980, 1981, and 1982, respectively. Petitioner also maintained a group of "packing and shipping" cost centers. These cost centers primarily were to design and engineer packing containers or materials for use by the EG packing and shipping operations. The costs in these cost centers included the cost of designing special packaging under particular contracts. When an employee worked on an item for a particular contract, his or her time was charged directly to a 1000 series account. The packing and shipping cost centers at issue had balances of $ 135,601, $ 182,643, and $ 225,551 for 1980, 1981, and 1982, respectively. "Material handling" cost centers captured the costs of receiving incoming direct and indirect material at the warehouse dock, storing the material in the warehouse, moving it to the production floor, and planning and scheduling group inventory. Some of these accounts included the costs of compensation of stock handlers in the EG warehouses whose primary responsibility was handling materials eventually used in the performance of its contracts and the costs of packing, shipping, and stock handling of supplies. Other accounts included the costs *341 of demurrage for freight carrier trucks that petitioner could not unload and demurrage for gas containers owned by petitioner's gas suppliers while the containers were in petitioner's possession. The material handling cost centers at issue had balances of $ 13,492,013, $ 16,979,390, and $ 20,447,513 for 1980, 1981, and 1982, respectively. Petitioner also maintained "research expense" cost centers. One group of cost centers was known as the Advanced Front-End Prototype Center (AFPC). The function of these cost centers was to develop manufacturing processes for the production of high-density, integrated circuits for eventual use in the EG products. Petitioner also maintained the Corporate Manufacturing Technology Center (CMTC) in its Corporate Research Development and Engineering Division to work on advanced technologies to assist in its manufacturing business. The costs charged by the CMTC for this research were captured in indirect work orders. The total balances of the cost centers associated with the AFPC and the work orders associated with the CMTC were $ 6,651,825, $ 9,379,657, and $ 11,306,503 for 1980, 1981, and 1982, respectively. Petitioner collected the costs of "employee *342 benefits" in various 4000 and 6000 series accounts. The costs collected in these accounts included, for example, insurance premiums for workers' compensation, product liability, and personal liability for petitioner's employees, costs of memberships and dues, and severance pay upon separation of service in the event of a reduction in work force. The balances of the accounts in which these employee benefits were collected were $ 2,640,213, $ 3,150,266, and $ 3,981,992 for 1980, 1981, and 1982, respectively. Petitioner also collected in various 4000 and 6000 series accounts "training costs". The costs collected in these accounts included, among others, salaries and wages of employees while enrolled in training courses, costs of producing training and personnel recruiting programs, and the costs of travel for employees while attending training courses. The balances of the accounts in which these costs were collected were $ 2,999,033, $ 2,815,608, and $ 3,765,183 for 1980, 1981, and 1982, respectively. Petitioner also collected in various 4000 and 6000 series accounts "recruiting costs". The costs collected in these accounts included storage of an employee's household goods when *343 the employee relocated from one site to another, costs of relocating existing and new employees, and other related recruiting expenses. The balances of the accounts in which these costs were collected were $ 5,569,965, $ 3,303,267, and $ 6,589,005 for 1980, 1981, and 1982, respectively. Petitioner also collected miscellaneous "marketing and selling expenses". These costs included, among others, the costs of marketing supplies, of attendance and exhibition at a convention or trade show, and of miscellaneous promotional activity. The balances of the various 4000 and 6000 series accounts in which these costs were collected were $ 22,413, $ 76,382, and $ 64,085 for 1980, 1981, and 1982, respectively. Petitioner also collected "security services" costs, which included costs of installation, repair, and maintenance of security devices and special security services such as guards to watch areas experiencing special security problems. The balances of the various 4000 and 6000 series accounts in which these costs were collected were $ 33,919, $ 55,283, and $ 36,983 for 1980, 1981, and 1982, respectively. Finally, petitioner recorded in a 4000 and 6000 series account the costs of "charitable *344 contributions". The balances in the accounts in which these costs were recorded were $ 20,300, ($ 8,824), and $ 72,420 for 1980, 1981, and 1982, respectively. Costs in Petitioner's 8000 Series Accounts
Cost centers 450 through 456 contained accounts in the 8000 series. The costs of these cost centers were incurred for major moves and rearrangement, including the cost of occupying a new building or moving out of an old building, and building maintenance for the EG facilities at various sites. They were not allocated to petitioner's long-term contracts. These rearrangements were planned and controlled at the group level. The balances in these cost centers were $ 13,659,397, $ 12,839,095, and $ 14,810,947 for 1980, 1981, and 1982, respectively. Cost centers 460 through 466 contained accounts in the 8000 series. The costs in these cost centers were incurred for mail, landscaping, cleaning, security, fire, and safety activities for the EG facilities at various sites and were not allocated to petitioner's long-term contracts. Where a specific contract required security of an extraordinary nature, the cost was charged directly to the contract. The balances in these cost *345 centers were $ 9,383,587, $ 10,711,242, and $ 10,740,929 for 1980, 1981, and 1982, respectively. Cost centers 230, 231, 250, and 431 contained accounts in the 8000 series. Cost centers 230 and 431 collected costs that were incurred in the performance of the administration of Government contracts. Cost center 231 was known as the Office of Government Affairs. The costs of this cost center were incurred to perform the function of interfacing with Government contract personnel, which included negotiation of Government-approved overhead rates, cost accounting standards, and allowable independent research and development costs. The costs in cost center 250 were incurred to perform the function of providing offices and services to Government contract auditors and administrators. Costs in these cost centers were not allocated to petitioner's long-term contracts. The balances in these four cost centers were $ 3,118,232, $ 3,573,203, and $ 4,257,132 for 1980, 1981, and 1982, respectively. Cost center 610 contained accounts in the 8000 series. The costs in this cost center were incurred in purchasing materials, equipment, supplies, and services for the EG and were not allocated to petitioner's *346 long-term contracts. The balances in this cost center were $ 3,363,227, $ 4,021,839, and $ 4,589,818 for 1980, 1981, and 1982, respectively. In 1981, petitioner reclassified various expenses in cost centers 450 through 454, 460 through 464, and 610 to cost of sales for financial statement purposes. Petitioner also reclassified costs in some of these cost centers in 1980. Casualty Loss
In November 1980, a number of gold "targets" and rods used in the manufacture of infrared systems were stolen from a stockroom. The estimated value of the stolen gold was $ 353,814.48, which was less than petitioner's basis in the property. Petitioner initially charged the cost of gold to a "common module holding account" (1000 series account), which collected the cost of producing a batch of items and divided the cost for the batch among the number of items produced. When the gold was stolen, petitioner replaced it and charged the common module holding account with the cost of the replacement gold. Petitioner had two insurance policies to cover such thefts. One policy had a $ 100,000 deductible and one had a $ 50,000 deductible. As of January 27, 1981, petitioner had not determined *347 under which of those policies it would file a claim. In 1981, petitioner received insurance settlements in the total amount of $ 264,282.76. Profit in Asset Depreciation
When the EG acquired a capital asset that was constructed either by the EG or another group, the asset was capitalized in petitioner's capital asset reporting system at its cost, plus an internal profit factor. Depreciation on these assets included depreciation on this internal profit factor, which was known as profit in asset (PIA) depreciation. The PIA adjustment related solely to intracompany transactions between groups or divisions of petitioner and was compiled to comply with Government cost accounting standards. In developing its overhead application rates for the manufacturing (4000) and engineering (6000) pools, petitioner used depreciation on the EG assets that included PIA depreciation. The depreciation charged to 4000 and 6000 series accounts included PIA depreciation. PIA depreciation attributable to its 4000 and 6000 pools was $ 2,831,167, $ 3,774,818, and $ 3,839,575 for 1980, 1981, and 1982, respectively. In preparing its consolidated financial reports, petitioner eliminated all PIA depreciation. *348 In preparing its Federal income tax returns for the years in issue, petitioner used the consolidated financial income, which reflected the elimination of the PIA depreciation. Petitioner also made Schedule M adjustments to reflect the deferral of income and expense on the EG contracts under the completed contract method. Petitioner decreased book income by the amount of income included for contracts not completed during the year and increased book income by the amount of the cost of goods sold for such contracts. The amount of the cost of goods sold on incomplete contracts that increased income in the Schedule M adjustment included PIA depreciation. The Schedule M adjustments with respect to the EG contracts were based on amounts prior to elimination of PIA depreciation at the consolidated level. Purchase Cash Discounts
When petitioner purchased material, it debited its inventory account and credited its accounts payable account for the full cost of the material. If petitioner paid the invoice within the discount period and was entitled to pay the discounted price, it debited the accounts payable account for the full price of the material, credited the cash account for *349 the discounted price, and credited account 3981 for the amount of the discount. This had the effect of increasing petitioner's income by the amount of the discount. Petitioner's income was decreased when the gross cost of goods purchased was deducted from income. The credit balances in account 3981 were $ 806,020, $ 501,177, and $ 454,711 for 1980, 1981, and 1982, respectively. Rework Labor and Scrap
In the course of petitioner's manufacturing, nonconforming parts were identified by quality assurance personnel. These parts either had to be conformed to their specifications, returned to the vendor, or scrapped. Petitioner maintained a series of general work orders to identify the costs of bringing parts into conformity with specifications and to identify the costs of scrapped parts. The costs so identified were included in 1000 series accounts. The total amounts of the rework labor costs were $ 2,883,309, $ 1,853,534, and $ 3,329,363 for 1980, 1981, and 1982, respectively. Scrap material costs, net of income from the sale of scrap, were $ 903,043, $ 941,216, and $ 1,121,942 for 1980, 1981, and 1982, respectively. Tax Treatment
For Federal income tax purposes, *350 petitioner did not make any Schedule M adjustments to account for its overhead variances. In its Federal income tax return for 1980, petitioner included in income the amount of its overhead variance (overapplied overhead). In its Federal income tax returns for 1981 and 1982, petitioner treated as a current expense the amount of its overhead variance (underapplied overhead). During the course of the audit of petitioner's Federal income tax return for 1979, respondent's agent and petitioner discussed whether petitioner had properly accounted for its overhead variances for that year and whether petitioner had allocated to its long-term contracts certain amounts in its 4000 and 6000 series accounts that could have been deducted currently. Respondent's agent also sent to petitioner an Information Document Request (IDR) and requested documentation to support petitioner's treatment of amounts in its 7000, 8000, and 9000 series accounts as costs described in section 1.451-3(d)(5)(iii), Income Tax Regs.
During the course of the audit of petitioner's Federal income tax returns for 1980, 1981, and 1982, respondent sent to petitioner an IDR, which contained a computation of petitioner's *351 overhead variances for those years, and requested a copy of petitioner's program for allocating its indirect costs to long-term contracts. That IDR also listed twelve 8000 series accounts and requested records to support petitioner's position that those costs were not allocable to its long-term contracts. Petitioner provided responses as to six of those items by describing those accounts. Petitioner also responded that it had erroneously allocated to its long-term contracts "scrap" and "employee benefits" and that those costs were described in section 1.451-3(d)(5)(iii), Income Tax Regs.
Respondent issued at least 13 additional IDR's and requested information regarding petitioner's treatment of certain of its 8000 series accounts, including records and descriptions of those accounts. Respondent also requested, in six of those IDR's, information as to the allocation of its overhead, including any records and a program or procedures manual that petitioner used in allocating its overhead to its long-term contracts. On one occasion, petitioner responded that amounts in one of its 8000 series accounts were costs described in section 1.451-3(d)(5)(iii), Income Tax Regs. In response *352 to respondent's request for information to support petitioner's previous response that it had erroneously allocated "scrap" to its long-term contracts, petitioner stated that it would file an amended return. In the statutory notice of deficiency, respondent determined that petitioner's treatment of its overhead variances was erroneous. Respondent allocated petitioner's overhead variances among work-in-progress, finished goods, and cost of goods sold and adjusted petitioner's taxable income accordingly. In its petition, petitioner alleged that it was entitled to deduct in the years in issue certain amounts that it contended had previously been erroneously capitalized and deferred as costs to its long-term contracts under the completed contract method of accounting (petitioner's affirmative claim). These claims would decrease petitioner's taxable income as follows: Employee Benefits
Rework
Research and
Year
and Other Costs
and Scrap
Development
1980
$ (28,640,000)
$ (13,904,280)
$ (5,174,000)
1981
(16,370,000)
( 5,475,979)
(4,403,000)
1982
(25,491,000)
( 3,009,934)
(5,840,000)
In an Amendment to Answer (respondent's affirmative claim), respondent asserted *353 that petitioner had included in its 8000 series accounts, and therefore deducted for Federal income tax purposes, certain general and administrative expenses that were incident to and necessary for the performance of its long-term contracts. Respondent asserted that petitioner was required to allocate those amounts to its long-term contracts. Respondent asserted increased deficiencies in petitioner's Federal income tax in the amounts of $ 19,014,590, $ 1,926,967, and $ 13,443,935 for 1980, 1981, and 1982, respectively. OPINION Completed Contract Rules
Section 1.451-3(d), Income Tax Regs., in effect for 1980, 1981, and 1982, provided the following rules for the completed contract method of accounting: (d) Completed contract method. -- (1) In general. * * * under the completed contract method, gross income derived from long-term contracts must be reported by including the gross contract price of each contract in gross income for the taxable year in which such contract is completed * * *. All costs which are properly allocable to a long-term contract (determined pursuant to subparagraph (5) of this paragraph) must be deducted from gross income for the taxable *354 year in which the contract is completed. * * * * * * (5) In determining what costs are properly allocable to a long-term contract in the case of a taxpayer utilizing the completed contract method of accounting for tax purposes, the following rules shall apply: (i) Direct material costs and direct labor costs must be treated as costs properly allocable to a long-term contract. * * * (ii) The term "indirect costs" includes all costs (other than direct material costs and direct labor costs) which are incident to and necessary for the performance of particular long-term contracts. Indirect costs which must be allocated to long-term contracts include: * * * (iii) Costs which are not required to be included in costs attributable to a long-term contract include:
Costs in section 1.451-3(d)(5)(ii), Income Tax Regs., included repair expenses and maintenance of equipment or facilities used in the performance of particular long-term contracts and administrative costs incurred in the performance of particular long-term contracts. Costs in section 1.451-3(d)(5)(iii), Income Tax Regs., included marketing and selling expenses, distribution expenses, general and administrative expenses *355 attributable to the performance of services that benefitted the long-term contractor's activities as a whole, casualty losses, certain pension and profit-sharing contributions, and costs attributable to strikes, rework labor, scrap, and spoilage. In 1982, the Department of the Treasury proposed to Congress a new system of accounting for long-term contracts and stated its intention "to amend the current completed contract regulations to require that most indirect costs (so-called period costs) be allocated to contracts rather than immediately expensed". Administration's Fiscal Year 1983 Economic Program: Hearings Before the House Committee on Ways and Means, 97th Cong., 2d Sess. (Part 1) 271 (1982) (statement of Hon. Donald T. Regan, Secretary of the Treasury). In the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 229(a)(3), 96 Stat. 324, 493, Congress did not adopt the proposal of the Department of the Treasury but directed it to modify the regulations "properly [to] allocate all costs which directly benefit, or are incurred by reason of, the extended period long-term contract activities of the taxpayer." The regulations as amended, however, are applicable *356 only to contracts entered into after December 31, 1982. T.D. 8067, 1986-1 C.B. 218, 219, 236-237. We therefore apply the regulations quoted above. Except where otherwise noted below, petitioner bears the burden of proof. Rule 142(a). The Parties' Positions
Petitioner's position is that it is entitled to deduct certain indirect costs that it collected in pools of costs in the 4000 and 6000 series accounts and allocated to its long-term contracts through the application of the overhead rates. These costs include those identified with the administrative, cost accounting, packing and shipping, material handling, and research expense cost centers, and the costs of employee benefits, training, recruiting, marketing and selling, security services, and charitable contributions described in our findings as the costs at issue. Petitioner argues that it was required to deduct these costs because they were described in section 1.451-3(d)(5)(iii), Income Tax Regs.
If the deduction of these costs constitutes a change in its method of accounting, petitioner contends that this change is not barred by section 446(e). Petitioner argues that that change was initiated *357 by respondent, who changed petitioner's method of accounting for its overhead variances. Petitioner also contends that it is entitled to adjust its income to account properly for its casualty loss in 1980, its PIA depreciation, its purchase cash discounts, and its rework labor and scrap costs. Respondent's position is that petitioner elected to capitalize and defer the indirect costs that it had allocated to its long-term contracts pursuant to section 1.451-3(d)(5)(ii), Income Tax Regs. Respondent contends that petitioner's attempt to deduct these costs constitutes a change in its method of accounting and that petitioner has not obtained consent for such a change. Respondent also argues that petitioner has not established that these costs are within the meaning of section 1.451-3(d)(5)(iii), Income Tax Regs., that they were initially allocated to long-term contracts, or the amount of these costs actually incurred. Respondent also contends that, in the notice of deficiency, she properly reallocated to petitioner's long-term contracts the overhead variances that it had previously included or deducted for Federal income tax purposes. Finally, respondent contends that some of the *358 expenses that petitioner included in its 8000 series accounts were required to be allocated to its long-term contracts pursuant to section 1.451-3(d)(5)(ii), Income Tax Regs.
Expert Testimony
Respondent offered the testimony and report of Edward B. Deakin (Deakin) in support of her position. The Court recognized Deakin as an expert in the fields of cost accounting and financial accounting. Deakin based his testimony and report on Generally Accepted Accounting Principles, standards promulgated by the Cost Accounting Standards Board, and other relevant accounting principles. Deakin concluded that petitioner's attempt to deduct costs in the 4000 and 6000 series accounts that it had allocated to its long-term contracts would constitute a change in method of accounting within the meaning of those accounting standards and principles. Deakin also concluded that respondent's adjustments to petitioner's overhead variances were the correction of an error and not a change in petitioner's method of accounting. Finally, he concluded that respondent's adjustments to certain costs in petitioner's 8000 series accounts were the correction of an error and not a change in petitioner's method *359 of accounting. Change in Method of Accounting
As a threshold matter, we address respondent's contention that petitioner's attempt to deduct certain indirect costs constitutes a change in its method of accounting for those items. (For this purpose only, we assume that those costs were described in section 1.451-3(d)(5)(iii), Income Tax Regs.) We then consider whether respondent's adjustments to petitioner's overhead variances and to certain indirect costs in petitioner's 8000 series accounts constitute changes in petitioner's method of accounting for those items. Section 446(a) provides that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 446(b), which is an exception to that general rule, provides that, "If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." "The term 'method of accounting' includes not only the over-all method of accounting of the taxpayer but *360 also the accounting treatment of any item." Sec. 1.446-1(a)(1), Income Tax Regs. Section 1.446-1(e)(ii), Income Tax Regs., provides in part: (ii)(a) A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. Although a method of accounting may exist under this definition without the necessity of a pattern of consistent treatment of an item, in most instances a method of accounting is not established for an item without such consistent treatment. A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. * * *
(b) A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability (such as errors in computation of the foreign tax credit, net operating loss, percentage depletion or investment credit). Also, a change in method of accounting does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking *361 of a deduction. * * * A change in the method of accounting also does not include a change in treatment resulting from a change in underlying facts. On the other hand, for example, a correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which had been consistently treated as an expense in the year of purchase involves the question of the proper timing of an item, and is to be treated as a change in method of accounting.
Each party urges an interpretation of section 1.451-3(d)(5), Income Tax Regs., that, in effect, is dispositive as to this change in method of accounting issue. We do not place undue emphasis on Deakin's testimony and report, inasmuch as he was allowed only to testify as an expert in cost and financial accounting matters and not in tax accounting matters. Respondent contends that, pursuant to section 1.451-3(d)(5)(iii), Income Tax Regs., a taxpayer may either deduct costs described therein or capitalize and defer those costs by allocating them to its long-term contracts. Respondent argues that petitioner is therefore bound by its election to allocate those costs. Petitioner contends that the deduction of costs *362 described in section 1.451-3(d)(5)(iii), Income Tax Regs., is not a matter of choice between two permissible alternatives. Petitioner asserts that a taxpayer is prohibited from allocating such costs to its long-term contracts and is required to deduct them currently. Petitioner cites Standard Oil Co. (Indiana) v. Commissioner, 77 T.C. 349 (1981), and argues that the current deduction of those costs "is merely the correction necessary to implement the method provided by the regulations" and is not a change in its method of accounting that requires the consent of the Commissioner. For the reasons discussed below, we reject petitioner's interpretation of section 1.451-3(d)(5), Income Tax Regs.
Petitioner's interpretation is not consistent with the apparent meaning of the regulation. Section 1.451-3(d)(1), Income Tax Regs., which was the operative rule for the completed contract method, provided that all costs that were "properly allocable to" a long-term contract were required to be deducted in the taxable year in which the contract was completed. Section 1.451-3(d)(5), Income Tax Regs., specified what costs were "properly allocable to" long-term contracts. *363 In contrast to certain direct costs, which "must" have been treated as costs "properly allocable to" a long-term contract, and to indirect costs described in subdivision (ii) (category (ii) costs), which "must" have been "allocated to long-term contracts", indirect costs described in subdivision (iii) (category (iii) costs) were "not required to be included in costs attributable to a long-term contract" and "may [have] been deducted currently". See McMaster v. Commissioner, 69 T.C. 952, 954-955 (1978). It does not follow that, because costs were "not required" to be included in costs "attributable to a long-term contract" and could have been deducted currently, they were prohibited from being treated as "costs properly allocable to" long-term contracts. The use of the permissive language in category (iii), in contrast to the mandatory language used in the first two categories, belies petitioner's contention that petitioner was required to deduct the costs described in section 1.451-3(d)(5)(iii), Income Tax Regs.
Petitioner also relies on section 1.451-3(a)(3), Income Tax Regs., in support of its contention that category (iii) costs were required to be deducted. *364 That section provided: (3) The percentage of completion method and the completed contract method apply only to the accounting for income and expenses attributable to long-term contracts. [The term "expenses attributable to long-term contracts" means all direct labor costs and direct material costs (within the meaning of paragraph (d)(5)(i) or (6)(i) of this section), and all indirect costs except those described in paragraph (d)(5)(iii) or, in the case of extended period long-term contracts, paragraph (d)(6)(iii).] Other income and expense items, such as investment income or expenses not attributable to such contracts and costs incurred with respect to any guarantee, warranty, maintenance, or other service agreement relating to the subject matter of such contracts, shall be accounted for under a proper method of accounting. See section 446(c) and sec. 1.446-1(c). [Emphasis supplied by petitioner.]
The bracketed portion of the quoted regulation was added by T.D. 8067, 1986-1 C.B. 218, 222, and does not apply to the years in issue. Petitioner, however, argues that the: new material merely codified the universal understanding of the *365 long-term contract regulation cost allocation rules from the time they were first issued in 1976 that costs described in Treas. Reg. sec. 1.451-3(d)(5)(iii) were costs which were not allocated to long-term contracts. * * *
Petitioner relies principally on a sentence in the Notice of Proposed Rule Making for the new completed contract regulations, to the effect that the indirect cost allocation rules applicable to long-term contracts that are not extended period long-term contracts were unchanged, to support its contention that its interpretation was universally understood. See 48 Fed. Reg. 10703 (Mar. 14, 1983). We cannot conclude from this this petitioner's interpretation of the regulation in effect for 1980, 1981, and 1982 was universally understood. Moreover, even were we to consider the effect of the new portion of that regulation, petitioner's interpretation of it is not the only plausible one. The new portion of the regulation could be construed to confirm that costs in the first two categories were required, but that category (iii) costs were not required, to be included as expenses attributable to long-term contracts. This interpretation is not inconsistent *366 with the statement of the Department of the Treasury (supra p. 24), upon which petitioner relies, that its intention was to amend the regulations to require that certain costs be allocated to long-term contracts rather than expensed currently. Again, that the regulations as amended (and applicable to years after those in issue here) expanded the scope of costs that were required to be allocated to long-term contracts does not mean that those costs were required to be deducted for years prior to the effective date of the amended regulations. We conclude that section 1.451-3(d)(5)(iii), Income Tax Regs., was not mandatory and did not require that costs described therein not be allocated to long-term contracts but instead be deducted by an accrual method taxpayer. Petitioner was not prohibited from allocating to its long-term contracts certain costs in its 4000 and 6000 series accounts. Petitioner's treatment of those items for Federal income tax purposes was consistent for 1980, 1981, and 1982 and was consistent with how those items were treated on its books for those years. See Casey v. Commissioner, 38 T.C. 357, 385-386 (1962). It follows that petitioner's *367 treatment of those items was a "method of accounting" within the meaning of section 1.446-1(a)(1), Income Tax Regs.
In light of our conclusion, petitioner's reliance on Standard Oil Co. (Indiana) v. Commissioner, 77 T.C. 349 (1981), is misplaced. There the taxpayer had elected to deduct intangible drilling costs (IDC), pursuant to section 1.612-4, Income Tax Regs., but had capitalized and expensed over the lives of the assets certain IDC. We rejected respondent's assertion that the taxpayer's attempt to deduct that IDC in the taxable years at issue was a change in its method of accounting that required the Commissioner's consent because: If the election [to deduct IDC] is made, all IDC must be deducted. Petitioner's tardy assertion that the "other" costs in issue should have been deducted does not * * * constitute a discretionary choice that such costs should be deducted. It is a discovery that petitioner failed to deduct costs which, under the accounting method it has chosen, had to be deducted. [Standard Oil Co. (Indiana) v. Commissioner, supra at 382-383.]
In this case, petitioner had a choice either to deduct *368 or to allocate to its long-term contracts category (iii) costs. Compare, e.g., Thompson-King-Tate, Inc. v. United States, 296 F.2d 290, 294 (6th Cir. 1961). Its attempt now to deduct those costs is not a "correction of internal inconsistencies" or a "mistake of law" that affected the computation of a deduction, the correction of which is "'tantamount to a mathematical error.'" Standard Oil Co. (Indiana) v. Commissioner, supra at 383 (citing North Carolina Granite Corp. v. Commissioner, 43 T.C. 149 (1964)). Also, petitioner was aware that these costs were potentially deductible, by its own admission, at least as of the time that it filed its Federal income tax return for 1979. Petitioner's attempt now to deduct such costs in 1980, 1981, and 1982 did not result from a "discovery" that it had failed to deduct those costs when it filed its returns for those years. Standard Oil Co. (Indiana) v. Commissioner, supra at 383. Petitioner's asserted "correction" of the allocation of those costs involves the proper time for the taking of a deduction and did not result from a "change in underlying *369 facts" within the meaning of section 1.446-1(e)(2)(ii)(b), Income Tax Regs. Compare ESCO Corp. v. United States, 750 F.2d 1466, 1470 (9th Cir. 1985) (accrual method taxpayer's employment of more sophisticated forecasting methodology in estimating its accrued claims expenses not a change in method of accounting). Petitioner's attempt to deduct those costs is a change in its treatment of material items. We conclude that such a change in treatment constitutes a change in its method of accounting for those items within the meaning of section 1.446-1(e)(ii)(a), Income Tax Regs. See Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 510-511 (1989). Our conclusion is not affected by the absence of an express provision in section 1.451-3(d)(5)(iii), Income Tax Regs., that such a change was to be considered a change in method of accounting for those items. Compare sec. 1.471-11(c)(2)(ii), Income Tax Regs.
In contrast, as petitioner points out, respondent's adjustment in the Amendment to Answer to allocate to petitioner's long-term contracts certain costs in its 8000 series accounts "in effect embraces the holding in" Standard Oil Co. (Indiana) v. Commissioner, supra. *370 Petitioner did not have a "discretionary choice" as to whether they were to be deducted. Id. at 382. Rather, those costs "must" have been "allocated to long-term contracts" pursuant to section 1.451-3(d)(5)(ii), Income Tax Regs.McMaster v. Commissioner, 69 T.C. at 955. We therefore conclude that, to the extent that petitioner was required to allocate those costs to its long-term contracts to comply with the regulations, respondent's proposed adjustments would not constitute a change in petitioner's method of accounting for those items within the meaning of section 1.446-1(e)(ii), Income Tax Regs.
Respondent now concedes that her allocation to petitioner's long-term contracts of its overhead variances (contrary to her own expert's conclusion) was a change in petitioner's method of accounting. By reallocating the overhead variances to petitioner's long-term contracts, respondent affected the timing of those items and thus changed petitioner's treatment of material items. We now consider whether petitioner's change in its method of accounting for the indirect costs in its affirmative claim is barred by section 446(e). That section *371 provides that a taxpayer must secure the consent of the Commissioner before computing his taxable income under a new method of accounting. "It is not sufficient for a taxpayer merely to show the correctness of the new method; that fact alone cannot justify a change without the Commissioner's consent." Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 681 (1980) (citing Wright Contracting Co. v. Commissioner, 316 F.2d 249 (5th Cir. 1963), affg. 36 T.C. 620 (1961)). We also explained in Southern Pacific Transportation Co. v. Commissioner, supra at 682: In addition, consent is required when a taxpayer, in a court proceeding, retroactively attempts to alter the manner in which he accounted for an item on his tax return. If the alteration constitutes a change in the taxpayer's method of accounting, the taxpayer cannot prevail if consent for the change has not been secured. Casey v. Commissioner, supra at 385-386 [Casey v. Commissioner, 38 T.C. 357 (1962)]; Cubic Corp. v. United States, an unreported case ( S.D Cal. 1974, 34 AFTR 2d 74-5895, 74-2 USTC par. 9667), *372 affd. per curiam 541 F.2d 829 (9th Cir. 1976).
In this case, petitioner did not request or obtain the consent of the Commissioner to deduct costs in its 4000 and 6000 series accounts. Petitioner contends, however, that its change in its method of accounting was initiated by respondent and that, under such circumstances, respondent cannot use section 446(e) as a "shield" to bar petitioner's changes. Petitioner argues that "This attempt to allow only those changes which increase TI's [petitioner's] taxable income violates basic principles of fairness". Petitioner relies principally on Commercial Security Bank v. Commissioner, 77 T.C. 145 (1981), and Gus Blass Co. v. Commissioner, 9 T.C. 15 (1947). In Commercial Security Bank, the cash basis taxpayer sold all of its assets, subject to liabilities, in a liquidation pursuant to section 337. The taxpayer included all of its "accrued interest receivables" and deducted all of its "accrued business liabilities" on its final Federal income tax return. Respondent accepted the inclusion in income of the receivables but denied the taxpayer's deduction of the liabilities. We *373 rejected respondent's contention that to allow the deduction would have the "effect of" permitting the taxpayer to change its method of accounting without the prior consent of the Commissioner, because we had concluded that the taxpayer had "effectively paid" the accrued liabilities. Commercial Security Bank v. Commissioner, supra at 151. Thus there was no change in the taxpayer's method of accounting. Petitioner, however, focuses on our statement that followed: Moreover, by requiring Orem to include "accrued interest receivables" in income, respondent has in effect put Orem on an accrual basis as to those items, and we think his reliance on a highly technical reading of his regulations to say that similar treatment should not be accorded to the "accrued business liabilities" is questionable. This observation is, we think, particularly applicable in the instant situation, where the items in question are, as far as this record reveals, not only of a character otherwise qualifying for deduction under sections 162 and 163 * * * but also appear to have been intimately related to the items of "accrued interest receivables." [Id. at 151.] *374 Petitioner argues that the items involved in this case are more "intimate" because "The legal issues involved in TI's claim and the Service's claim are the same, that is, whether the costs are required to be allocated to the contracts" or accounted for currently in income. We recognize that the overhead variances, simply stated, are the difference between the actual overhead and the overhead costs collected in petitioner's 4000 and 6000 series accounts through the application of the overhead rates. The amount of the overhead variances is directly affected by the costs that were collected in the 4000 and 6000 series accounts. Inversely, however, the 4000 and 6000 series accounts are not directly affected by the reallocation of those overhead variances to petitioner's work-in-progress, finished goods, and cost of goods sold accounts. Thus, it is not a harsh result to allow respondent to reallocate the overhead variances and to preclude petitioner's adjustments to exclude certain costs from the overhead pools. Id. The "harsh" result is that respondent's reallocation of the overhead variances increases petitioner's taxable income in two of the years in issue, while petitioner's *375 changes would decrease its taxable income. Also, respondent's change in petitioner's method of accounting for its overhead variances is a change in petitioner's method of accounting for those items and not, as petitioner asserts, a change in its method of accounting for all of its overhead costs. We therefore decline to hold in this case that the asserted relationship between the overhead variances and the indirect costs that petitioner now seeks to deduct either (1) establishes that respondent initiated a change in petitioner's method of accounting for those costs or (2) negates petitioner's obligation to seek the permission of the Commissioner prior to changing its method of accounting for those costs. Petitioner also relies on the events that transpired during the audits of its returns to support its position. Petitioner offered the IDR's, and its responses to those IDR's, that respondent issued to petitioner during the course of respondent's audits of petitioner's returns for 1979, 1980, 1981, and 1982. The Court received those documents into evidence solely to show the sequence of events for purposes of determining whether petitioner had adopted a method of accounting for, *376 and whether it had changed its method of accounting for, certain of the costs in its 4000 and 6000 series accounts that it had allocated to its long-term contracts. Those documents suggest that whether petitioner's treatment on its Federal income tax returns of all of the costs at issue was proper was considered by both parties during the course of those audits. We cannot infer (or give any effect to the inference), however, that petitioner's obligation formally to seek the permission of the Commissioner to change its method of accounting for its category (iii) costs was abrogated because respondent was aware of and considered petitioner's treatment of these costs, whether raised initially by petitioner or only in response to respondent's inquiry into the treatment of those costs or other related costs. That respondent inquires into the taxpayer's treatment of an item on a return and subsequently makes an adjustment to an item that constitutes a change in the taxpayer's method of accounting does not open the door and allow the taxpayer to change its method of accounting for any "related" items. The facts in Gus Blass Co. v. Commissioner, supra, are also *377 distinguishable from the facts in this case. In that case, the taxpayer was on the accrual method except that, with respect to installment sales, it annually posted to an unrealized profit account a percentage of its uncollected installment receivables at the end of the year. Respondent determined that the taxpayer's income from installment sales should be computed on the accrual method and disallowed the taxpayer's deduction for the increase in its unrealized profit account for that year. Pursuant to regulations in effect for that year, a taxpayer was required to include in income the balance in its unrealized profit account if it had applied for and was granted permission to change from the installment to the accrual method. Because that requirement applied whether the change was "made at the direction of the Commissioner or upon the application of the taxpayer", and because the change was directed by the Commissioner, we concluded that the taxpayer was not required to "secure formal permission to change in order to comply with the regulations." Gus Blass Co. v. Commissioner, 9 T.C. at 35-36. In this case, respondent did not require in the first instance *378 that petitioner change its method of accounting for its overhead costs. In sum, if (as it contends) petitioner was unable to determine which of the category (iii) costs could be deducted on its 1979 return "because of time constraints existing when it received permission to use the completed contract method", it could have rectified the problem prior to the time that it filed the returns for 1980, 1981, and 1982. Thereafter, petitioner could have sought permission to change its method of accounting. See Rev. Proc. 80-51, 1980-2 C.B. 818. Petitioner's attempt to deduct those costs constitutes a change in its method of accounting for those items. Not having sought the permission of the Commissioner to change its method of accounting for those items, petitioner cannot complain that "basic principles of fairness" are being violated. We therefore conclude that petitioner's attempt to deduct the indirect costs that petitioner contends were described in section 1.451-3(d)(5)(iii), Income Tax Regs., is barred by section 446(e). Respondent's Adjustments to Overhead Variances
Respondent possesses broad discretion to determine whether a particular method *379 of accounting clearly reflects income and to require a change to a method that, in her opinion, does clearly reflect income. Capitol Federal Savings & Loan v. Commissioner, 96 T.C 204, 209 (1991). "Respondent's authority under section 446(b) reaches not only overall methods of accounting, but also a taxpayer's method of accounting for specific items of income and expense." Prabel v. Commissioner, 91 T.C. 1101, 1112 (1988), affd. 882 F.2d 820 (3d Cir. 1989). In reviewing changes in accounting methods under section 446(b), the taxpayer must establish that respondent abused her discretion. Prabel v. Commissioner, supra at 1112. To satisfy that heavy burden, the taxpayer must show that respondent's adjustments under section 446(b) were clearly unlawful or plainly arbitrary. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979) (quoting Lucas v. Structural Steel Co., 281 U.S. 264, 271 (1930), and Lucas v. American Code Co., 280 U.S. 445, 449 (1930)); Prabel v. Commissioner, supra at 1112. Where a taxpayer *380 demonstrates that the taxpayer's method of accounting clearly reflects income, respondent cannot require that taxpayer to change to a different method even if, in respondent's view, her method more clearly reflects income. Molsen v. Commissioner, 85 T.C. 485, 498 (1985). Whether the particular accounting method clearly reflects income is a question of fact. Coors v. Commissioner, 60 T.C. 368, 394 (1973), affd. 519 F.2d 1280 (10th Cir. 1975). If the taxpayer's method of accounting is explicitly authorized by the Internal Revenue Code or by the regulations, respondent may not reject that method as not providing a clear reflection of income if the taxpayer has applied that method on a consistent basis. Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 31 (1988). Also, if that method of accounting reflects a consistent application of generally accepted accounting principles, it will ordinarily be regarded as clearly reflecting income. Hallmark Cards, Inc. v. Commissioner, supra at 31; sec. 1.446-1(a)(2), Income Tax Regs. But see Thor Power Tool Co. v. Commissioner, supra at 539-540. *381 Section 1.451-3(d)(6), Income Tax Regs., authorized the use of burden rates to allocate indirect costs to long-term contracts but did not provide for the treatment of overhead variances. For Federal income tax purposes, petitioner included in income the amount of its overhead variance for 1980 and deducted the amount of its overhead variances for 1981 and 1982. In the notice of deficiency, respondent allocated those overhead variances among work-in-progress, finished goods, and cost of goods sold and adjusted petitioner's taxable income accordingly. The full absorption inventory rules provided that a taxpayer was required to reallocate to its ending inventory variances unless "such variances are not significant in amount in relation to the taxpayer's total actual indirect production costs for the year". See sec. 1.471-11(d)(3)(ii), Income Tax Regs. Although the regulation did not specify what was "significant", a variance of less than 3 to 5 percent was generally considered insignificant. See 1 Schneider, Federal Income Taxation of Inventories, sec. 4.04[4][a], at 4-87 (1991). For 1980, 1981, and 1982, petitioner's overhead variances, expressed as a percentage of the total *382 actual overhead, were (0.261), 2.169, and 0.026, respectively. Thus, at least under the full absorption inventory rules, petitioner's overhead variances for the years in issue were not significant. Deakin stated in his report that overhead variances must be adjusted to reflect actual costs for "taxes, and financial reporting purposes" but that, for financial reporting purposes, "these adjustments may be waived because they are deemed immaterial." He further explained that petitioner's overhead variances for 1980, 1981, and 1982 were deemed immaterial for financial reporting purposes by petitioner's external auditors. Thus petitioner's method of not reallocating its overhead variances to its long-term contracts was in accordance with generally accepted accounting principles. Also, the purpose of the completed contract method of accounting is to account for the entire results of a contract at one time. National Contracting Co. v. Commissioner, 37 B.T.A. 689, 702 (1938), affd. 105 F.2d 488 (8th Cir. 1939). "Income is recognized under this method for the taxable year in which the contract is finally completed and accepted, and deduction of costs *383 properly allocable to the contract is deferred until such time as the income is recognized." Peninsula Steel Products & Equip. Co. v. Commissioner, 78 T.C. 1029, 1046 (1982); fn. ref. omitted. The variances in this case, as respondent acknowledges, were "not a separate type of cost" but were merely the difference between estimated and actual costs. Given the nature of the variances and that the use of burden rates that gave rise to the variances was authorized by section 1.451-3(d)(6), Income Tax Regs., we conclude that petitioner's method of accounting for those variances was not inconsistent with the completed contract method of accounting, and our review of the record does "not reveal any significant distortions of income". Peninsula Steel Products & Equip. Co. v. Commissioner, supra at 1049. We recognize respondent's broad discretion in making adjustments under section 446(e). In this case, however, petitioner's method of accounting for its overhead variances reflected consistent application of generally accepted accounting principles for financial reporting purposes for 1980, 1981, and 1982. Hallmark Cards, Inc. v. Commissioner, 90 T.C. at 31; *384 sec. 1.446-1(a)(2), Income Tax Regs. Further, the amounts of petitioner's variances were not significant under the full absorption inventory rules in effect for the years in issue. Finally, petitioner's method of accounting for those variances was not inconsistent with the completed contract method of accounting. That respondent's method of accounting for those variances may have more clearly reflected petitioner's income does not entitle her to change petitioner's method. Molsen v. Commissioner, 85 T.C. at 498. On these facts, we conclude that petitioner's method of not reallocating its variances to its long-term contracts clearly reflected its income. Respondent abused her discretion in requiring petitioner to reallocate its overhead variances to its long-term contracts. Prabel v. Commissioner, 91 T.C. at 1112. Respondent's Affirmative Claim
In an Amendment to Answer, respondent asserted that petitioner included in its 8000 series accounts, and deducted for Federal income tax purposes, general and administrative expenses that were incident to and necessary for the performance of its long-term contracts. Respondent contends *385 that the costs included in various cost centers that contained 8000 series accounts were costs described in section 1.451-3(d)(5)(ii), Income Tax Regs., and that petitioner was required to allocate such costs to its long-term contracts. Respondent has the burden of proof as to this issue. See Rule 142(a). We explained in McMaster v. Commissioner, 69 T.C. 952, 956 (1978), that the "telling distinction" between the types of costs described in section 1.451-3(d)(5)(ii) and in section 1.451-3(d)(5)(iii), Income Tax Regs., is one of degree. That is, category (ii) costs "relate to and benefit individual contracts", while category (iii) costs "benefit the business as a whole." Being a question of degree, the facts in this case do not support the conclusion that any of the costs in respondent's affirmative claim related to and benefited individual contracts and did not benefit petitioner's business as a whole. Cost centers 450 through 456 collected costs that were incurred for major moves and rearrangement and building maintenance, and cost centers 460 through 466 collected costs that were incurred for landscaping, cleaning, security, fire, and safety activities. *386 That petitioner allocated to its long-term contracts group occupancy charges through accounts 4975 (manufacturing) and 6975 (engineering) suggests that those charges may have been related to individual contracts but does not establish, as respondent contends, that the costs in cost centers 450 through 456 and 460 through 466 were thus required to be allocated. Moreover, the types of costs that were collected in those cost centers were distinct from the group occupancy charges. Respondent also argues that her position with respect to these cost centers is supported by their reclassification to costs of sales in 1981 for financial statement purposes and by Deakin's testimony that this reclassification showed that petitioner's "accountants believed that these costs were associated with their manufacturing or contract activities." The significance of this evidence, as it relates to the proper tax accounting treatment of costs in these cost centers, was not explained and is not apparent. Respondent also contends that costs collected in cost centers 230 and 241, which were incurred in the administration of Government contracts, and in cost centers 231 and 250, which related to interfacing *387 with Government contract personnel and auditors, were administrative costs described in section 1.451-3(d)(5)(ii)(L), Income Tax Regs. These functions were "related" to the EG's contracts in the broad sense. That is, 80 to 85 percent of the EG's business was from long-term contracts, and a majority of those contracts (over 2,000) were with the United States Government. Thus respondent has not proved that the costs in those cost centers related to and benefitted individual contracts and did not relate to the EG's business (long-term contracts) as a whole. McMaster v. Commissioner, 69 T.C. at 956. Similarly, respondent has not proved that the costs collected in cost center 610, which included costs of purchasing materials, equipment, supplies, and services for the EG, were incurred for and therefore related to and benefitted individual contracts. Finally, respondent contends in a footnote in her brief that "other costs in the 8000 series accounts are required to be allocated." Throughout trial of this case, it was not clear to the Court (or to petitioner) exactly what other costs and cost centers were related to respondent's affirmative claim. This passing *388 reference in her brief has shed no light on this matter, and we decline to scrutinize the vast record in search of other costs that may fall within the broad net that respondent cast in her Amendment to Answer. We conclude that respondent has not satisfied her burden of proving that any of the costs in her affirmative claim were required to be allocated to petitioner's long-term contracts. Casualty Loss
Section 165 generally allows a taxpayer to deduct losses arising from the theft of property in the year that the theft is discovered. Sec. 165(a), (e); sec. 1.165-1(d)(3), Income Tax Regs.Section 1.451-3(d)(5)(iii)(G), Income Tax Regs., provided that section 165 losses were not required to be allocated to long-term contracts. The amount of the loss allowable as a deduction shall not exceed the taxpayer's adjusted basis in the property. Sec. 1.165-1(c)(1), Income Tax Regs.
A loss within the meaning of section 165 is allowed as a deduction only for the taxable year in which the loss is sustained. Sec. 1.165-1(d)(i), Income Tax Regs. Where there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the theft loss *389 with respect to which reimbursement may be received is sustained until it can be ascertained whether or not such reimbursement will be received. Sec. 1.165-1(d)(3), Income Tax Regs. The portion of the loss that is not covered by a claim for reimbursement with respect to which there is a reasonable prospect of recovery is sustained during the taxable year in which the theft occurred. Sec. 1.165-1(d)(2)(ii), Income Tax Regs. Thus a loss "may be sustained in a year following the year when the casualty actually occurred, particularly where there is insurance involved". Gale v. Commissioner, 41 T.C. 269, 275 (1963). In this case, the theft, which was discovered in November 1980, was covered by two insurance policies. The value of the stolen gold was $ 353,814.48. As of the end of 1980, petitioner had not determined under which of those policies it would file a claim. Because one policy had a $ 100,000 deductible and one had a $ 50,000 deductible, we conclude that petitioner sustained a casualty loss of $ 50,000 deductible in 1980. In 1981, petitioner received insurance settlements in the total amount of $ 264,282.76. We therefore conclude that petitioner *390 sustained a casualty loss of $ 39,531.72 deductible in 1981 ($ 353,814.48 minus $ 264,282.76, less $ 50,000.00 deductible in 1980). PIA Depreciation
Petitioner contends that it is necessary to reverse the amounts of PIA depreciation contained in its Schedule M adjustments in order correctly to state its income. PIA depreciation was charged to petitioner's 4000 and 6000 series accounts. In preparing its Federal income tax returns for the years in issue, petitioner used the consolidated financial income shown on its financial statements, which reflected the elimination of the PIA depreciation. Petitioner made Schedule M adjustments to reflect the deferral of income and expense on the EG contracts under the completed contract method. The net effect of the Schedule M adjustments was that petitioner overstated its taxable income by the amount of PIA depreciation. Petitioner erroneously failed to eliminate the PIA depreciation prior to making the Schedule M adjustments, where it had been eliminated at the consolidated financial level, and the effect was to double-count the increase to taxable income resulting from this adjustment. Petitioner should be allowed to correct that *391 error. Respondent cites only section 1.1502-13(c)(1)(ii)(b), Income Tax Regs., which allows members of a consolidated group to defer intercompany profit on sales. That section is inapposite. The PIA depreciation in issue was depreciation on intracompany transactions between groups or divisions of a single corporation. Purchase Cash Discounts
Petitioner also contends that it should be allowed to deduct the amount of its purchase cash discounts to prevent the overstatement of the direct material costs allocated to its long-term contracts. In allocating its direct material costs to its long-term contracts, petitioner debited its inventory account and credited its accounts payable account for the full cost of the material. If petitioner paid the invoice within the discount period and was entitled to pay the discounted price, it debited the accounts payable account for the full price of the material, credited the cash account for the discounted price, and credited account 3981 for the amount of the discount. This had the effect of increasing petitioner's income by the amount of the discount. Its income was decreased, however, when the gross cost of goods purchased *392 was deducted from income. Section 1.451-3(d)(5)(i), Income Tax Regs., incorporated by reference section 1.471-3(b), Income Tax Regs., to determine the elements of direct material costs. That section provides that cost means: (b) In the case of merchandise purchased since the beginning of the taxable year, the invoice price less trade or other discounts, except strictly cash discounts approximating a fair interest rate, which may be deducted or not at the option of the taxpayer, provided a consistent course is followed. * * * [Sec. 1.471-3(b), Income Tax Regs.] Whether a discount approximates a fair interest rate is to be determined based on all of the facts and circumstances. See Warfield-Pratt-Howell Co. v. Commissioner, 13 B.T.A. 305, 310 (1928). We found no evidence in the record as to the terms of any discounts received by petitioner and there is no basis to conclude that the discounts it received did not approximate a fair interest rate. We therefore reject petitioner's tardy assertion that "conventional discounts received by TI on purchases" did not approximate a fair interest rate and would thus not fall within section 1.471-3(b), Income Tax *393 Regs.
Moreover, petitioner's treatment of that item for Federal income tax purposes was consistent for 1980, 1981, and 1982 and was consistent with how those items were treated on its books for those years. That treatment was a "method of accounting" within the meaning of section 1.446-1(a)(1), Income Tax Regs. Petitioner's attempt to alter its treatment of its purchase cash discounts has the effect of postponing the reporting of income and is a change in its treatment of a material item. That change in treatment constitutes a change in its method of accounting within the meaning of section 1.446-1(e)(ii)(a), Income Tax Regs. Because petitioner has not sought the permission of the Commissioner to effect this change, petitioner's claim is barred by section 446(e). Rework Labor and Scrap
Finally, petitioner contends that it should be entitled to deduct the costs identified as rework and labor. Petitioner argues that these costs, which were incurred to bring parts into conformity with specifications and to identify the costs of scrapped parts, are deductible under section 1.451-3(d)(5)(iii), Income Tax Regs. These costs were included in 1000 series accounts as direct material. *394 Like petitioner's treatment of purchase cash discounts, its treatment of these items was a "method of accounting" within the meaning of section 1.446-1(a)(1), Income Tax Regs., and its attempt to alter its treatment of those items constitutes a change in its method of accounting within the meaning of section 1.446-1(e)(ii)(a), Income Tax Regs. Petitioner's claim on this issue is also barred by section 446(e). Issue 2: Petitioner's Rebate Programs
FINDINGS OF FACT Rebate History
From 1976 through 1982, petitioner offered various rebate programs for some of its consumer products. For financial reporting purposes, petitioner generally accrued amounts that it expected to pay out to redeem rebate requests that it received. These accruals offset income from sales in the current accounting period. Amounts were usually accrued on a monthly basis but sometimes were not accrued until the last month of a quarter. Payments made subsequent to the accrual were charged to, and reduced, the balance of the account. Petitioner used two liability accounts, accounts 2349 and 2350, to record its liability for its rebate programs. To determine the financial cost of a consumer rebate *395 program, petitioner estimated a "redemption rate" before it was initiated. The redemption rate was the expected number of rebate requests to be received and was expressed as a percentage of sales. From August 23, 1976, to October 15, 1976, petitioner offered a consumer rebate on the SR-56 Scientific Calculator (the SR-56 rebate program). As of September 1976, petitioner had recorded $ 79,900 in account 2350 for the SR-56 rebate program. That amount was determined by anticipating, at the beginning of the program, the gross number of rebate requests to be redeemed and then subtracting from that figure the number of requests received at year-end. Petitioner recorded additional amounts during the accounting period and offset the account by payments, yielding a net balance of $ 710 in the account at the end of December 1976. On its Federal income tax return for 1976, petitioner deducted the amount paid in 1976 for SR-56 rebates, plus the $ 710 balance of account 2350. Petitioner did not reverse that balance on its Schedule M. From August 15, 1977, to October 31, 1977, petitioner offered a consumer rebate on the TI-58 Programmable Calculator and the TI-59 Programmable Calculator *396 (the TI-58/59 rebate program). In 1977, petitioner recorded an amount in account 2349 for the TI-58/59 rebate program. That amount was determined by anticipating, at the beginning of the program, the gross number of rebate requests to be redeemed and then subtracting from that figure the number of rebate requests received at year-end, which yielded a year-end balance of $ 69,880. On its Federal income tax return for 1977, petitioner deducted the amount paid in 1977 for TI-58/59 rebates, plus the $ 69,800 balance of account 2349. Petitioner did not reverse that balance on its Schedule M. TI-59 Rebate Program
From August 1, 1981, to December 31, 1981, petitioner offered a $ 20 consumer rebate on TI-59 Programmable Calculators purchased on or between those dates (the TI-59 rebate program). Pursuant to the terms of that program, consumers were eligible to receive the $ 20 rebate if the rebate request was postmarked by January 15, 1982, and if they submitted: (1) A sales receipt dated on or between August 1, 1981, and December 31, 1981, (2) a completed customer information card, and (3) a coupon. Coupons for this rebate program were available in magazine and newspaper advertisements *397 and on counter cards and in flyers that were available in stores. The coupons were inducements for sales, and a consumer was not required to purchase a TI-59 calculator to obtain a coupon. These coupons, as well as those offered in conjunction with petitioner's other rebate programs described below, set forth the terms of the program and instructed the consumer to provide certain information. Petitioner designed the TI-59 rebate program to ensure that the consumer actually purchased the TI-59 calculator. United Marketing Services (UMS) was an independent agent that petitioner employed to process rebate requests for the TI-59 rebate program. UMS conducted validity checks to ensure that consumers complied with the terms of that program. Petitioner would pay or advance to UMS sufficient money to allow UMS to process consumer rebates during a given period. Petitioner calculated its 1981 total liability for the TI-59 rebate program, $ 108,299, by multiplying an estimate of total redemptions by the estimated costs of redeeming each rebate request and then subtracting from that figure amounts that petitioner had advanced to UMS. Petitioner had recorded $ 108,000 in account 2349 as *398 of December 31, 1981. The estimate of total redemptions included the number of rebate requests that UMS had received as of January 6, 1982, 12,077, and the number of additional rebates that petitioner expected would be received 3,000. Different methods were used to arrive at that estimate. One method used a percentage of estimated total retail "take-away", which was the amount of product that was sold off a retailer's shelves in a given month. Another method involved tracking rebate requests and factoring in the average delay time between the date of purchase and the date that rebate requests were received. As of January 6, 1982, petitioner had advanced $ 200,000 to UMS for the TI-59 rebate program. UMS had received 14,202 TI-59 rebate requests as of February 26, 1982, and had spent $ 250,300 for the TI-59 rebate program as of that date. Petitioner did not deduct the $ 108,000 balance in account 2349 for the TI-59 rebate program on its Federal income tax return for 1981. In preparation of its 1981 Form 1120, petitioner prepared Schedule M #5-10 and reversed the $ 108,000 balance in account 2349, because that amount was not fixed and determinable. Petitioner deducted $ 308,299 *399 for the 1981 TI-59 rebate program on an amended Federal income tax return that it filed for 1981. The Home Computer Rebate Program
From September 1, 1982, to January 31, 1983 (a date that was subsequently extended to April 15, 1983), petitioner offered a $ 100 consumer rebate on its home computers purchased by retail consumers on or between those dates (the home computer rebate program). Pursuant to the terms of that rebate program, consumers were eligible to receive the $ 100 rebate if the rebate request was postmarked by February 10, 1983 (a date that was subsequently extended to April 15, 1983), and if they submitted: (1) An original sales receipt, (2) a completed user information card, (3) a coupon, and (4) the words "Model PHC-004A DESC: 99/4A QTY 1" cut out from the home computer box (the proof of purchase). Coupons for the home computer rebate program were available in magazine and newspaper advertisements and in stores. The coupons were inducements to sales, and a consumer was not required to purchase a home computer to obtain a coupon. Petitioner designed the 1982 home computer rebate program to ensure that the consumer actually purchased the home computer. As *400 of April 5, 1983, petitioner did not have written procedures for processing home computer rebate requests. Where petitioner approved a rebate request without all of the required documentation, additional procedures were used to verify the validity of the claim. For purposes of computing its book income from sales of the home computer, petitioner established a reserve for future redemptions. As of December 31, 1982, the home computer rebate liability, which was reflected in account 2350, was $ 21,642,400 (rounded to $ 21,643,000). That book reserve was computed by multiplying an estimate of total redemptions (including future redemptions) by the cost of redeeming each rebate request and then subtracting from that figure amounts petitioner had paid to consumers as of December 31, 1982. Petitioner multiplied the rebate cost per unit, $ 100, by the sum of the cumulative retail "take-away" and the ending inventory as of that date. Petitioner then multiplied an expected redemption rate of 80 percent by that amount to arrive at a gross liability as of December 31, 1982. The $ 100 home computer rebate program was petitioner's first program in which it offered a rebate on home computers. *401 Petitioner based the 80-percent redemption rate on past experience with rebate programs of smaller dollar amounts. As of December 31, 1982, petitioner had received 114,500 home computer rebate requests. As of June 27, 1983, it had received 405,122 home computer rebate requests and issued 403,048 checks for a minimum of $ 100 each. For Federal income tax purposes, petitioner prepared Schedule M #4-15 to adjust the home computer rebate reserve recorded in account 2350 to reflect its fixed and determinable liability, based on rebate coupons actually received as of December 31, 1982. Petitioner deducted $ 11,450,000 ($ 8,100,000 in rebate payments made through December 31, 1982, plus $ 3,350,000, as an accrued liability as of December 31, 1982) for the home computer rebate program on its 1982 return. On an amended Federal income tax return that petitioner filed for 1982 (1982 Form 1120X), petitioner deducted $ 29,742,400 ($ 8,100,000 paid plus $ 21,642,400) for the home computer rebate program. The Learning Aids Rebate Program
From October 15, 1982, to January 31, 1983 (a date that was subsequently extended to May 31, 1983), petitioner offered a $ 15 consumer rebate on certain *402 talking learning aids purchased by retail customers on and between those dates. Petitioner also offered a $ 10 rebate on its Speak and Spell Compact and a $ 5 rebate on modules for the talking learning aids purchased by retail customers during that same period (collectively referred to as the learning aids rebate program). Pursuant to the terms of that rebate program, consumers were eligible to receive the rebate if the rebate request was postmarked by February 10, 1983 (a date that was subsequently extended to May 31, 1983), and if they submitted: (1) An original sales receipt, (2) a coupon, and (3) a proof of purchase from the product box or manual enclosed in the product box. A proof of purchase was the product name within a dotted bubble from the front panel of certain of the product boxes or the top right corner of the manual enclosed in certain of the other product boxes. Coupons for the learning aids rebate program were available in magazine and newspaper advertisements and in stores. The coupons were inducements to sales, and a consumer was not required to purchase the product to receive a coupon. Petitioner designed the learning aids rebate program to ensure that the *403 consumer actually purchased the learning aids. UMS processed rebate requests for this rebate program. In some cases, UMS gave consumers a rebate even if they failed to submit the proof of purchase. Typically, this involved a telephone discussion with or letter from the consumer and, in most instances, each case was discussed with one of petitioner's employees. For purposes of computing its book income from sales of the learning aids, petitioner accrued $ 9,155,000 for the learning aids rebate program in account 2350. Petitioner reduced that liability by $ 1,545,344, the amount petitioner reimbursed UMS for learning aids rebates paid by UMS by the end of 1982. Petitioner's books reflected a $ 7,609,656 balance as an accrued liability for the learning aids rebate program as of December 31, 1982. That book reserve for future redemptions was computed, essentially, in the same manner as the reserve for the home computer rebate program. Petitioner based its expected redemption percentage on experience that it had with other similar rebate programs. UMS issued a total of $ 9,783,214 in rebate checks for the learning aids rebate program. For Federal income tax purposes, petitioner *404 prepared Schedule M #4-15 to adjust its learning aids rebate reserve recorded in account 2350 to reflect its fixed and determinable liability ($ 1,862,400), based on rebate coupons actually received by UMS as of December 31, 1982, but not yet paid. Petitioner deducted $ 3,407,400 ($ 1,545,000 in rebate payments made as of December 31, 1982, plus $ 1,862,400) for the learning aids rebate program on its 1982 Form 1120. Petitioner claimed as a deduction for 1982 the total of the learning aids rebates paid as of December 31, 1982, $ 1,545,344, plus the balance in account 2350 as of December 31, 1982, $ 7,609,656, on its 1982 Form 1120X. The Speech Synthesizer Rebate Program
From September 1, 1982, through January 31, 1983, petitioner offered a consumer rebate in which customers who purchased six software command cartridges or two software albums for the home computer, on and between those dates, were entitled to a free speech synthesizer (speech synthesizer rebate program). Consumers did not have to purchase the home computer to receive the speech synthesizer. Pursuant to the terms of that rebate program, consumers were eligible to receive the speech synthesizer if the rebate *405 request was postmarked by February 15, 1983, and if they submitted: (1) An original sales receipt, (2) a coupon, and (3) the end flaps with the number 1043601-1 from each command cartridge box. Coupons for the speech synthesizer rebate program were available in magazine and newspaper advertisements and in stores. The coupons were inducements to sales, and a consumer was not required to purchase software command cartridges or software albums to receive a coupon. Petitioner designed the speech synthesizer rebate program to ensure that the consumer actually purchased the software packages. In a limited number of cases, consumers received a speech synthesizer even though they failed to comply with all of the terms of the speech synthesizer rebate program. The considered decision to grant the rebate request was based upon the consumer's explanation for the failure to submit all of the required documentation. For purposes of computing its book income from sales of the software command cartridges and software albums, petitioner recorded $ 753,000 in account 2349 for the speech synthesizer rebate program. Based on revised ending inventory figures, petitioner, on June 20, 1983, estimated *406 that the December 31, 1982, liability for the speech synthesizer rebate program would be $ 680,800. That amount was computed by applying an estimated speech synthesizer redemption rate to the estimated number of home computer units expected to be redeemed. Petitioner subtracted the number of speech synthesizers shipped as of December 31, 1982, 24,100, to arrive at a net unit liability, 29,600. The net unit liability was multiplied by the estimated cost of the speech synthesizer, $ 23. The estimated speech synthesizer redemption rate was based, in part, on past rebate programs under which petitioner offered consumers a product. This program, however, was the first of its kind in that consumers were required to buy a number of or combination of products to qualify for the product rebate. As of June 27, 1983, petitioner had received 168,554 rebate requests and shipped 168,306 speech synthesizers. Petitioner deducted $ 135,677 as an accrued liability for the speech synthesizer rebate program on its Federal income tax return for 1982. Petitioner claimed as a deduction the accrued liability for that program as of December 31, 1982, $ 753,000, on its 1982 Form 1120X. (Petitioner *407 now concedes that the proper amount was $ 680,800.) In its petition, petitioner asserted that it was entitled to deduct the amounts paid for its 1981 and 1982 rebate programs, plus the year-end reserve balances for estimated future redemptions, as reported on its Forms 1120X for those years. OPINION Petitioner's position is that it has satisfied the requirements of section 1.451-4, Income Tax Regs., and that it is therefore entitled to deduct the amounts claimed on its 1981 and 1982 Forms 1120X for its rebate programs. Respondent's position is that petitioner has not satisfied the requirements of that section. Respondent also contends that petitioner seeks to change its method of accounting with respect to the rebate programs and that permission to effect such a change was not requested or granted as required by section 446(e). Section 1.451-4(a)(1), Income Tax Regs., provides, in part: If an accrual method taxpayer issues trading stamps or premium coupons with sales * * * and such stamps or coupons are redeemable by such taxpayer in merchandise, cash, or other property, the taxpayer should, in computing the income from such sales, subtract from gross receipts with respect *408 to sales of such stamps or coupons * * * an amount equal to -- (i) The cost to the taxpayer of merchandise, cash, and other property used for redemptions in the taxable year, (ii) Plus the net addition to the provision for future redemptions during the taxable year (or less the net subtraction from the provision for future redemptions during the taxable year).
The purpose of that regulation is to match revenues with expenses incurred in generating those revenues, and taxpayers are entitled to a present deduction for only that portion of the stamps or coupons that will eventually be redeemed. See Mooney Aircraft, Inc. v. United States, 420 F.2d 400, 411 (5th Cir. 1969); see also Rev. Rul. 78-212, 1978-1 C.B. 140. Respondent first contends that petitioner's coupons "were merely part of advertisements inducing potential customers to purchase petitioner's products" and were not issued "with sales" within the meaning of section 1.451-4, Income Tax Regs. Respondent cites Rev. Rul. 73-415, 1973-2 C.B. 154, and Rev. Rul. 78-212, supra. Revenue rulings are not substantive authority *409 but are merely a statement of the Commissioner's position with respect to a specific factual situation. Stark v. Commissioner, 86 T.C. 243, 250-251 (1986). In Rev. Rul. 73-415, supra, the taxpayer had distributed, through the mail or in periodicals, advertisements that entitled consumers to a reduction in the sales price of an article when the consumers presented the coupon at the time of purchase. Respondent determined that those "coupons were not issued with sales", because they were "distributed gratuitously to the general public as an inducement to purchase the taxpayer's products." Similarly, in Rev. Rul. 78-212, supra, the taxpayer issued coupons that entitled consumers to a discount on the sales price of certain products that they would purchase in the future. Coupons that were issued in connection with an advertising campaign or in weekly newspaper advertisements were not issued with sales. In contrast, the taxpayer did issue with sales of its product coupons that appeared on the face of the package (on-pack) or were included in the package (in-pack). Respondent, however, determined that *410 these coupons were not "redeemable in cash, merchandise or other property" because an additional purchase of the retailer's product by the consumer was required. Rev. Rul. 78-212, supra at 141. The facts on which the cited rulings were based are distinguishable from the facts in the instant case. Under the terms of petitioner's rebate programs, consumers were required to submit to petitioner a coupon that was available in magazine and newspaper advertisements and in stores. In each instance, that coupon set forth the terms of the rebate program and instructed the consumer to provide certain information. Under those terms, the consumer was required to submit to petitioner an original sales receipt and some additional type of proof of purchase. In the TI-59 and the home computer rebate programs, that proof of purchase was a customer information card, which was packaged with the product that the consumer purchased. In the home computer, the speech synthesizer, and the learning aids rebate programs, that proof of purchase was some part of the product box or, in the latter program, a corner of a manual enclosed in the product box. Petitioner required *411 such proofs of purchase in each of those programs to ensure that the consumer actually purchased the product. Thus, consumers were required to submit to petitioner an item that was issued "with sales" and, at least in the case of all of the rebate programs except the speech synthesizer rebate program, were not required to purchase an additional product to be entitled to the rebate. Also, it is not dispositive in this case that the coupons that petitioner distributed were "inducements to sales". By their nature, rebate programs are designed to promote and increase the sale of a product. See Brown & Williamson Tobacco Corp. v. Commissioner, 16 T.C. 432, 434 (1951). Rather, the issue is whether the in-pack or on-pack proofs of purchase that petitioner issued with sales were "coupons" within the meaning of section 1.451-4, Income Tax Regs.
The in-pack and on-pack proofs of purchase that petitioner issued were similar to those in Rev. Rul. 78-212, supra, which respondent determined were coupons within the meaning of section 1.451-4, Income Tax Regs. Although not defined in the regulation itself, the term "coupon" generally includes *412 "a token or certificate given with a purchase and redeemable in merchandise or cash" and "a trademark, wrapper, box top, or similar evidence of a purchase for which premium articles are given". Webster's Third New International Dictionary (1976). We conclude that the in-pack and on-pack proofs of purchase that petitioner issued with sales, which were required to be submitted to petitioner to entitle consumers to a rebate, were "coupons" within the meaning of section 1.451-4, Income Tax Regs.
Specifically with respect to the speech synthesizer rebate program, respondent also argues that that program was "conditional" because a consumer "was required to buy the TI Home Computer and six cartridges of software" to qualify for a speech synthesizer. Consumers were not required to purchase a home computer as part of that rebate program. Moreover, nothing in the regulation prohibits a taxpayer from requiring that a fixed number of coupons issued with sales be submitted to entitle the consumer to the rebate. See Brown & Williamson Tobacco Corp. v. Commissioner, supra at 434. Finally, respondent argues that petitioner did not follow the accounting method prescribed *413 in section 1.451-4, Income Tax Regs., because petitioner gave rebates to consumers in certain instances where the consumer did not comply with all of the terms of a particular rebate program. Where such requests were granted, however, petitioner or UMS had taken measures to verify that the consumer had actually purchased the product. Petitioner's failure to require exacting compliance with the terms of its rebate programs in every instance did not preclude petitioner's right to use that method of accounting. See Brown & Williamson Tobacco Corp. v. Commissioner, supra at 435; Creamette Co. v. Commissioner, 37 B.T.A. 216, 218 (1938). Respondent next contends that, even if petitioner is entitled to use that method of accounting, petitioner failed to establish the amount of the reserve for its rebate programs in accordance with the regulation. The determination of the provision for future redemptions is computed by multiplying estimated future redemptions by the estimated average cost of redeeming each trading stamp or coupon. Sec. 1.451-4(b)(1)(i), Income Tax Regs. The term "estimated future redemptions" means the number of "trading *414 stamps or coupons outstanding as of the end of such year that it is reasonably estimated will ultimately be presented for redemption." Sec. 1.451-4(b)(1)(ii), Income Tax Regs.A taxpayer may use any method of determining the estimated future redemptions as long as that method is used consistently and "results in a reasonably accurate estimate of the stamps or coupons outstanding at the end of such year that will ultimately be presented for redemption". Sec. 1.451-4(c)(1)(i), Income Tax Regs.Whether the expected redemption is reasonable is a question of fact. See Brown & Williamson Tobacco Corp. v. Commissioner, supra at 444-445; Frontier Saving Stamps, Inc. v. United States, 6 AFTR 2d 5092, 60-2 USTC par. 9654 (N.D. Tex. 1960). Section 1.451-4(c)(2), Income Tax Regs., provides: Normally, the estimated future redemptions of a taxpayer shall be determined on the basis of such taxpayer's prior redemption experience. However, if the taxpayer does not have sufficient redemption experience to make a reasonable determination of his "estimated future redemptions", or if because of a change in his mode of operation or other *415 relevant factors the determination cannot reasonably be made completely on the basis of the taxpayer's own experience, the experiences of similarly situated taxpayers may be used to establish an experience factor.
Respondent argues that petitioner does not have sufficient redemption experience because the home computer and the learning aids rebate programs were the "first of their type." Section 1.451-4(c)(2), Income Tax Regs., however, does not require that a taxpayer demonstrate that its estimated future redemptions be based on its experience with an identical redemption program, only that it be based on "prior redemption experience." Our task is only to determine if petitioner's estimates of its future redemptions were "reasonable." Petitioner estimated a redemption rate, the expected number of rebate requests to be received expressed as a percentage of sales, as part of the process of determining the financial cost of a consumer rebate program before it was initiated. The estimated redemption rates used in all of petitioner's rebate programs were based on petitioner's past experience with other rebate programs, as required by section 1.451-4(a), Income Tax Regs. We are *416 satisfied that the methods petitioner used in establishing those redemption rates were sound. Also, those rates are reasonable when viewed in light of the actual number of rebate requests received and the amounts paid in those rebate programs. We therefore conclude that petitioner has established that its provisions for future redemptions were reasonable and in accord with the requirements of section 1.451-4, Income Tax Regs.
In the alternative, respondent contends that petitioner seeks to change its method of accounting with respect to its rebate programs. Respondent asserts that petitioner accounted for its rebate programs for 1976, 1977, 1981, and 1982 under the accrual method of accounting and that petitioner is now seeking to change its method of accounting for a material item. Petitioner computed its year-end book liability for its 1976 and 1977 rebate programs by determining, as of the beginning of the program, the gross number of rebate requests that it expected to redeem and then subtracting the number of rebate requests received at year-end. Because those rebate programs terminated prior to year-end, that liability that was booked may have also satisfied the all events *417 test. See sec. 1.446-1(c)(1)(ii), Income Tax Regs. What is determinative, however, is that petitioner's method of establishing that liability was consistent with the method provided in section 1.451-4, Income Tax Regs., and was the same method that petitioner used to determine its year-end liability on its books and its income from sales for the rebate programs at issue. See sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs.
For Federal income tax purposes for 1976 and 1977, petitioner deducted the year-end liability that it had computed under that method, in addition to the amounts that it had paid. For 1981 and 1982, petitioner erroneously failed to deduct for Federal income tax purposes the year-end reserves that it computed on its books for its 1981 and 1982 rebate programs. We conclude that petitioner's attempt to deduct those amounts is not a change in its method of accounting for its rebate programs. Compare, e.g., Casey v. Commissioner, 38 T.C. 357, 384-385 (1962). Issue 3: Investment Tax Credit Issue
FINDINGS OF FACT In the notice of deficiency, respondent made adjustments to investment tax credits (ITC) in the amount of $ 1,881,573. During trial *418 of this case, petitioner made substantial concessions, reducing the amount of the disputed ITC to approximately $ 1,260,000. The parties made further concessions in their briefs. There remain, however, over 200 assets with respect to which petitioner contends it is entitled to an ITC. These assets fall, generally, into 13 categories. Our findings with respect to the assets within each of these categories are set forth below. Unfortunately, this issue requires lengthy and detailed treatment. (The parties, the Court, and the public might better be served by submitting technical factual issues of this type to technically qualified arbitrators under Rule 124.) For the convenience of the parties, and to facilitate our analysis, we have identified each of these assets by a tag number that was generated in the course of petitioner's business and by reference to the location of the plant or facility with which each of those assets is associated. Waste Treatment Facilities
Petitioner built two structures in which it housed equipment used in the waste treatment processing systems at Dallas (the Dallas facility) (asset 976683) and at S.W. Houston (the S.W. Houston facility) (assets *419 976248, 976249, 976250, 976262-1, and 976265-1). Waste treatment is an integral part of the manufacturing operations at those sites. The 40- by 66- by 20-foot Dallas facility had a concrete floor, walls, and roof. The size of the facility was determined by laying out the various pieces of equipment necessary for the waste treatment processing system and creating an enclosure for such equipment. The walls were not constructed until some of the equipment was already in place. There were no restrooms, no windows, two pedestrian doors, and two cargo doors in a dock that was used for receiving chemicals and other supplies. The Dallas facility had steel stairways and catwalks or grates that established five to six levels to provide access to the tanks and other pieces of equipment. The space between pieces of equipment was narrow and cramped, as were the catwalks and grates. The Dallas facility was heated, but the walls and roof of the facility were not insulated and did not dissipate heat from the equipment or prevent condensation on the equipment. They protected the equipment from sun and rain. The concrete floor had tiers and trenches and served as a containment vehicle in *420 the event untreated fluids flowed onto the floor. If metals were detected in the waste or rinse water stream, that stream was pumped onto the floor where it drained into a sump and was held until it was pumped into one of the two metal treatment streams treated within the facility. This was a critical function of the facility and the walls and doors aided in this function, although the doors did not have any special seals. The Dallas facility could contain 20,000 to 30,000 gallons of fluid. Spills have occurred and have been as deep as 16 to 17 inches. Equipment was installed on 6-inch concrete pads to protect the equipment from spills. The waste treatment processing system in the Dallas facility was highly automated, but an operator had certain responsibilities, which included monitoring and activating certain processes and the filter press; maintaining an adequate supply of treatment chemicals and other reagents and periodically adding these chemicals to the batch processes; and performing occasional preventative maintenance. In 1982, these responsibilities dictated that an operator devote one-half of each shift in that facility. As constructed, the Dallas facility did not *421 have an enclosed control room. An air-conditioned control room was subsequently built. It contained a desk and chair, personal computer, calculator, telephone, alarm clock, reference books, and bulletin board. A maintenance team from the manufacturing plant made a 5- to 10-minute walk-through of the waste treatment plant once a day and performed any maintenance tasks required. Although similar systems were constructed to operate outdoors, the waste treatment system in the Dallas facility could not have been operated outdoors because of the possibility that freezing would disrupt the system. Petitioner used 50-percent caustic reagents, which freeze at temperatures between 55 and 60 degrees Fahrenheit, as neutralizing agents in this waste treatment process. With modifications and installation of additional equipment, the system could have been operated outdoors. Alternatively, petitioner could have installed a waste treatment processing system with heated lines and tanks that could tolerate outdoor conditions. In either event, part of the system, including the control room and the ultrafiltration equipment, would have had to have been indoors. Although it had conducted no formal *422 studies as to alternative uses, petitioner did not consider it feasible, in part because of the size of the facility and its construction, to use the facility for any other purpose. Like the Dallas facility, petitioner constructed the S.W. Houston facility to house and to protect the waste treatment processing equipment and to contain spills. The 118- by 44- by 25-foot S.W. Houston facility had no windows, five pedestrian doors, and five roll-up type doors, two of which permitted the installation and removal (as required) of two large filter presses. The walls and the roof were not insulated and were not designed to allow heat to dissipate from the equipment or to prevent condensation on the equipment, but they sheltered the equipment and provided protection from freezing. Except for the control room and laboratory, the facility was not air conditioned. In addition to the equipment and walkways to access the equipment, a dock used for receipt and storage of chemicals, a storage room for sulphur dioxide, and a small toilet room were located on the ground level. The spaces between the equipment, between the equipment and the walls, and on the catwalks were narrow. The concrete *423 floor collected any spills in the containment pit, from which the spilled fluids were pumped back through the waste treatment processing system. The floor had sloping contours, which were approximately 4 inches in places, that led to floor drains that were connected to the spill containment pit. The walls and doors aided in this spill containment function in that they contained spills adequately to prevent any substantial amount of fluids from leaking outside the structure, although the doors did not have watertight seals. Equipment was installed on 3- to 4-inch concrete pads. On the second level was a small air-conditioned room that contained the control room and a laboratory. Catwalks were used by the operator to examine the equipment and to add chemicals used in the processing system. The processes for treating the two waste treatment streams at the S.W. Houston facility were highly automated and were operated by a programmable logic controller. This system was operated by one person working an 8-hour shift and was operated for two 8-hour shifts per day. In addition to programming the necessary commands into the controller, the operator's responsibilities included starting *424 the system, performing tests, operating the filter presses, monitoring certain fluid levels, performing minor maintenance, and adding chemicals to the equipment as required. Major maintenance was performed by a crew from the nearby manufacturing facilities. The waste treatment processing system also included equipment located outside the facility itself. Petitioner did not experience any problems with freezing of this equipment. The system in the S.W. Houston facility could have been operated outdoors with modifications such as the installation of heated lines and a different neutralizing agent. Petitioner used a slurried lime mixture, which was susceptible to freezing, as a neutralizing agent to treat the waste streams processed by this system. Most of the other equipment could have operated outdoors, but the control room and laboratory had to be located indoors. Because of the cost, petitioner did not consider it feasible to convert the facility for use for any purpose other than waste treatment. Drywall Partitions
Petitioner used drywall partitions to construct "clean rooms", computer rooms, and rooms that were used to control noise or other factors. Employees regularly *425 worked in these enclosed areas. Clean rooms were structures in which petitioner controlled the temperature and the humidity and limited the contamination to a process or product. These environmental controls were necessary for the manufacturing that was conducted within the rooms. The drywall did not possess any special or unique qualities that contributed to the cleanliness of the room. The filtering function was performed by the air-handling equipment that forced air through the room through high-efficiency particle filters in the ceiling and, in some cases, through perforations in the floor. A clean room could not be constructed without, at least, enclosing an area with walls, a ceiling, and a floor. These clean rooms varied in size from 1,400 to 49,000 square feet. The following assets included drywall used to construct clean rooms: Assets 976035-9 (Dallas-N. Building); 973992, 973992-1, 974233, 974334, 975488-2 (S.W. Houston); 973797 and 975467 (Sherman); and 973967 (Lewisville). Petitioner constructed computer rooms in which it controlled the temperature and the humidity, which was necessary for the proper operation of the computer equipment. A computer room could not *426 be constructed without, at least, enclosing an area with walls, a ceiling, and a floor. Although the drywall confined the air, equipment located outside the structure controlled the temperature and humidity inside the structure. The following assets included drywall that formed the walls, or some of the walls, in computer rooms: Assets 976703 and 976705 (Dallas-S. Building); 973771, 974133, and 976034-4 (Forest Lane); and 2179168-1 (Johnson City). At its Attleboro plant, petitioner used drywall to construct the buffing line room (asset 2039809), which was used to polish chrome. This drywall had a 2-inch sound blanket that aided in containing the noise and dust produced from the equipment used in the room. Petitioner also used drywall to construct the roller, stretcher, leveler room in Building 4 at Attleboro (asset 2039939-6). Air-handling equipment controlled the temperature in the room, which was necessary to maintain the dimensional tolerances of the metal processed in that room. The following assets included drywall that was used to construct structures to control noise or to provide protection from objects in manufacturing areas: Asset 974106 (Lewisville), asset 976038 *427 (Lewisville), and asset 2179115-2 (Johnson City). Petitioner constructed with drywall a structure to enclose telephone equipment at Lubbock (asset 975600). The telephone equipment required a temperature-controlled environment, and the drywall helped to contain the cooled air. The telephone equipment supported the entire Lubbock site. The following assets included drywall that petitioner used to construct structures and to enclose areas, in part, for security reasons: Assets 974133, 973771, 976034-4, and 974026 (Forest Lane); 972804, 973669, 976214, and 976832 (Lewisville); 976652 (Colorado Springs); and 2179168-1 (Johnson City). All of the drywall was gypsum board or Sheetrock and was screwed or nailed onto each side of metal studs and secured at the floor and ceiling or roof deck (except for asset 2039809, which was constructed on top of a 4-foot concrete wall). The drywall joints were bedded, taped, floated, and finished. In certain clean rooms, the drywall was sealed with an enamel and plastic covering on the interior to prevent the release of any particles in the room. The drywall was not installed to facilitate its removal, and drywall of this type was not generally reused *428 because the resulting damage and labor required upon removal made reuse uneconomical. The structures constructed in part with drywall partitions were sometimes converted to other uses. In one instance, a portion of one of the computer rooms was left empty and another portion of the room was put to a different use. Miscellaneous Structures and Related Equipment
Petitioner built a 25- by 30-foot metal structure to protect the main electrical switch gear for the Attleboro site (asset 2038151). It had steel walls, a steel roof, a flat concrete floor, no windows, two personnel doors, and one overhead door. The structure had minimal insulation and heating and was not air conditioned. The equipment in the facility occupied between 20 and 50 percent of the floor, and the unoccupied floor space was required for access to and removal of equipment. There were numerous 6-inch holes in the floor through which electrical cables passed. No employees were assigned to work in the structure, but a desk and a file cabinet were placed there. Petitioner also built a structure (asset 973365) at Lewisville to protect water pumps. (Included in the costs associated with this asset were the *429 pumps, the water storage tank, a fuel oil tank, and a fuel oil containment pit.) The 250,000-gallon water tank and water pumps were part of the fire protection system for the entire Lewisville facility. The fire protection system would have been required regardless of whether any manufacturing activity was conducted in any of the buildings at that site. The water tank itself was one side of the 65- by 67-foot structure, which was heated to prevent the water in the smaller pipes leading to or from the pumps from freezing. There was no work area within and no workers were assigned to the structure. The 161,000-gallon fuel oil tank was part of a secondary or backup power supply system to the primary gas supply for the operation of the boilers. Boilers were used to provide hot water for humidification for certain manufacturing areas and to heat the buildings. The fuel oil containment pit was a concrete-lined pit designed to contain the fuel oil in the event of a failure of the tank and to prevent pollution of the surrounding environment. At Johnson City, petitioner excavated a pit for a concrete foundation and spill containment area around a 160,000-gallon fuel oil tank (asset *430 2179085-1). The containment area around the tank was constructed to prevent contamination of storm sewer systems if the tank was punctured. Petitioner built a 5,000-square-foot extension to Module J at the N.W. Houston plant, which allowed petitioner to drive four truck chassis with box bodies into the area for the installation of seismic recording devices (assets 975938, 975940, 975941, 975942, 975943, and 975945). The extension was air conditioned to provide a controlled work environment for the seismic equipment that was to be installed. Petitioner never used the extension to outfit seismic trucks. It was used (for a time) to store modular furniture. Petitioner subsequently filled in the lower portion of the structure, which raised it 49 inches to the level of the remainder of the floor around the perimeter, and it has since been used as an incoming dock area for an adjacent repair facility for petitioner's products. The sprinklers, air conditioners, utilities, and other components remained in place and in use. Petitioner built a bonding mill room inside Building 3 at Attleboro (asset 2038053) to keep contaminants emitted from the surrounding manufacturing activities from *431 entering the room in order properly to bond metals. Petitioner controlled the environment in the room by forcing air into the room with equipment located outside the structure. Petitioner also built a 1,600 square-foot laboratory inside Building 10 at Attleboro (asset 2038075). Approximately seven or eight employees worked in this laboratory. The laboratory had three smaller rooms inside. The 8- by 8-foot smaller rooms each contained testing equipment. Technicians entered these smaller rooms to set up tests and to retrieve samples. Petitioner installed a door, glass windows, and louvers at Attleboro (asset 2039808). The door provided access to, and louvers allowed air to flow into, the mechanical room, which contained air-handling equipment for the buffing line room. The glass windows were installed to provide visual access to the buffing line room. Petitioner also installed doors in the buffing line room (asset 2039850), and doors and windows in the roller, stretcher, leveler room in Building 4 at Attleboro (assets 2039939, 2039939-1, and 2039939-5, respectively). Floors
Petitioner constructed supporting columns and laid a 20,400-square-foot concrete floor in the *432 Saw Building at Sherman, which housed the circular silicon saws and the heavy lapper machines that were used in manufacturing silicon wafers (assets 974242-1 and 974242-2). The concrete floor was designed at 300 pounds per square foot live load to support the silicon saws and lappers, while most of petitioner's floors were designed at 100 pounds per square foot. The floor was designed for a 300-pound per square foot live load throughout the building to allow for expansion of the saw and lapper areas. The floor was a reinforced concrete slab, which was constructed integrally with structural steel floor beams to support the heavy loads. It was supported by the concrete columns that extended from the basement floor to the floor itself and from the basement floor through the floor at issue to the roof. During the years in issue, approximately one-third to two-fifths of the floor was used to support activities that did not require the amount of support that the heavy machinery required. Petitioner also built wood decking and laid a concrete ground floor in the support module that contained the anechoic chambers at Lewisville (assets 973668 and 975665). These chambers provided an *433 environment without extraneous acoustic interference to test the guidance and seeker portion of the HARM missile. The support module had an area of approximately 40,000 square feet and extended from the concrete ground floor, which was 8 feet below grade, to a height of 30 feet. The 8-inch concrete ground floor was the load-bearing floor at the base of the module. Although it was thicker than the 5- to 6-inch floors petitioner laid in other modules, the 8-inch slab was of standard construction. The wood decking was constructed 8 feet above the concrete flooring to provide employee access to the anechoic chambers and did not provide structural support for equipment in the module. The wood decking covered the module. Petitioner later removed the wood decking and replaced it, in places, with concrete floors and mezzanines. Window Walls
Petitioner installed window walls primarily along the spines of its buildings to provide separation, access, a barrier from noise transmission, a degree of security, and a pleasing architectural effect. The spine refers to that portion of the building to which the modules were connected and, in effect, were the main hallways in those buildings. *434 The spine was a permanent part of the building. Some of the window walls were installed on concrete curbs. The following assets are the window walls at issue: 973455, 973456, and 973457 (Forest Lane); 973435, 973436, 975673, 975704, 975705, 975814, and 976833 (Lewisville); 974480 (Lubbock); 973659 (Midland); 974640, 974641, 974642, 974643, 974644, 974645, and 974646 (N.W. Houston); and 974301 (S.W. Houston). Some of these window walls, which were constructed of clear float glass and mounted with gaskets and rubber grommets in aluminum frames, contained glass doors or other openings. The window walls were not load-bearing, and they were movable. Petitioner temporarily opened window walls to allow large pieces of equipment to pass from one area of the building to another and sometimes if it reconfigured an area. A window wall could be removed by first removing the grommet or gasket, removing the glass from the frame, and then unscrewing the mullions and floor and ceiling track. Removing the grommet or gasket required a special tool. The other steps required hand tools. Three or four people could move a window wall or remove a panel of window wall and put in a doorway within *435 approximately half a day. Petitioner generally hired subcontractors to perform this work. Except for some slight scarring on the floor, the window walls, the floor, and the remainder of the building did not sustain damage when a window wall was removed. Ceilings
Petitioner installed suspended ceilings, which were composed of a metal grid and lay-in panels, in, among other areas, laboratories, clean rooms, and computer rooms. The perimeter of the metal grid was a shelf that was screwed to the interior walls, and the balance of the metal grid (the T-Bar) was laid on the metal shelf and supported by wires that were hung through metal clips screwed to the structural steel beam that supported the roof. The panels were laid horizontally onto the metal grid and were not attached to the grid. The suspended ceilings had openings for sprinkler heads, lay-in lighting, and diffusers for air conditioning. The ceiling grid also supported the lighting system. Petitioner also installed suspended "baffle" ceilings, which were rectangular acoustical panels that were hung vertically from wires attached to a horizontal metal grid that was hung by a rod attached to the roof structure. *436 At Lewisville, petitioner installed baffles (asset 973671) above the wood decking in the support module and in other manufacturing and administrative areas ($ 139,400 of the costs included in assets 973442, 973443, and 973444). Petitioner installed other ceilings in the spines of its buildings. Petitioner laid tectum panels into a grid composed of steel I-beams bolted together. Utility lines, including water lines and compressed air lines, ran above the ceilings in the spines. Except for temporary removal for access to overhead utilities, the tectum ceiling panels have generally remained in place since their original installation. All of the suspended ceiling panels (together with the supporting metal grid), the tectum ceiling panels, and the vertical ceiling baffles were movable and would cause minimal damage to the walls or ceilings if moved. Entire ceilings have been removed in connection with space reconfiguration, and petitioner temporarily removed panels to obtain access to utilities overhead. The following assets were suspended ceilings in conference rooms, cafeterias, kitchens, restrooms, lobbies, offices, and break areas, as well as tectum ceiling panels in spines: *437 973744 (College Station); 972726-1, 972727-1, 975050, 975051, 975052, 975053, 975054, and 975055 (Forest Lane); 2179165 and 2179219 (Johnson City); 975816 and 976842 (Lewisville); 973580, 973605, 973624, 973637, and 973651 (Midland); 974647, 974648, 974649, 974650, 974651, 974652, 975966, and 975967 (N.W. Houston); 976773 (Renner Road); 974305 (S.W. Houston); 973789 (Temple); and 2134084 (Versailles). Of the costs included in assets 973442, 973443, and 973444 (Lewisville), $ 42,900 was for ceiling panels in the spine area and $ 1,500 was for suspended acoustical ceilings. These suspended ceilings (excluding the tectum ceilings) were similar to the suspended ceilings in computer facilities and laboratories. Assets 2179116-1 (Johnson City) and 2134171 (Versailles) were suspended ceilings in rooms that were constructed to provide a controlled environment. Petitioner also installed suspended ceilings in computer rooms at Johnson City and Dallas (assets 2179176-3 and 976700, respectively), in the circuit design organization room in the south building at Dallas (asset 976711), and in the Saw Building at Sherman (asset 974252). Air Conditioning
A 10-ton roof-mounted air-conditioning *438 unit was installed for the telephone room at Lewisville (asset 975447). The heat-sensitive equipment in that room would not operate if the temperature reached certain levels. The room was cooled by the building cooling system, and this unit ensured that the equipment would continue to operate in the event of a cooling failure or plant power failure. It was connected to the emergency power generator and did not support any other part of the building. Plumbing
Petitioner installed an underground water line for a building at Dallas where it processed deionized water, which was used for manufacturing that required pure water (asset 975135-7). This water line did not serve any other function. Plumbing installed in Module E at Forest Lane supplied chilled water, compressed air, and city water only for equipment or machinery used in classified manufacturing processes (asset 974130). Plumbing was also installed to supply compressed air that was used to operate pneumatic tools and to clean parts in the HARM missile area at Lewisville (asset 975669-1). The compressed air was not used in the operation or maintenance of the building. Similarly, plumbing was installed to supply *439 compressed air, vacuum, industrial waste, and city water to Module C at N.W. Houston, where petitioner manufactured Infoterm (asset 975246). These lines were used solely in connection with equipment or machinery used in that manufacturing process and were not used in the operation or maintenance of the building. Emergency Doors
Petitioner installed six doors in the CIC module at Lewisville (asset 975856). The metal interior doors and the glass exterior doors, which were located in concrete vestibules exterior to the building, were installed to allow emergency egress for its employees. Petitioner installed emergency doors throughout the building. Emergency doors are required in virtually every factory or office building for the protection of employees and for the operation and maintenance of the building. The interior metal doors provided some additional security for computers that were in the CIC module in that metal doors were not as easily broken into as glass doors. Fire Protection Systems
Petitioner installed fire sprinkler lines and heads in the buffing line room (asset 2039806) and in the duct work of four chemical exhaust systems at Attleboro (assets 2039842, *440 2039843, 2039844, and 2039845). These fire sprinkler lines were connected to the general building fire protection systems. The lines in the buffing line room extended into the exhaust system duct work that was used exclusively for that room and into the buffing booths where the heads were located. The chemical exhaust system lines extended into the duct work where the sprinkler heads were located. The heads in these systems were installed inside the duct work to control any fire that could ignite from material exhausted. There were other sprinkler systems in the buildings but the systems at issue were designed to contain the fire at that point and to prevent further damage to the rest of the building or the area. In this sense, the systems at issue provided more localized fire protection than that provided by the general building fire protection system. The heads in the chemical exhaust system duct work had a separate alarm and could be triggered before the building fire protection heads if there was a fire inside the duct work. These systems were installed for insurance reasons rather than to meet building code requirements. Fire sprinkler lines and heads were dropped between *441 the carousel storage racks and into foam hoods at the Temple warehouse (asset 975547-1). The carousel storage racks were used to store parts used in manufacturing or finished products. Because the carousel storage racks were erected underneath a mezzanine area within the warehouse, the warehouse sprinkler system did not provide fire protection for that area. General building practice dictated that a sprinkler system be located beneath overhead horizontal surfaces, such as the mezzanine, that formed a floor. The foam hoods served as the fume exhaust equipment for the foam units. The fire protection lines in the carousel area and the foam hoods were connected to the sprinkler system lines for the warehouse. Petitioner installed fire sprinkler heads and a jockey pump in the pumphouse at Forest Lane (assets 974951-1, 974970-1, and 974996-2). The jockey pump provided water pressure for the Forest Lane fire protection system. Petitioner also installed sprinkler heads and plumbing lines in clean rooms at S.W. Houston (assets 974339, 974353, 974456, 975609-7, and 975488-5). Those systems were installed in the clean rooms by dropping the plumbing lines from the existing building fire *442 protection sprinkler system, which was located above the clean room ceilings, into the ceilings of the clean rooms and attaching sprinkler heads onto the lines. One of the systems was the CO[2] fire protection sprinkler system in a clean room area. This system included a CO[2] sprinkler beneath the raised floor and the conventional dropped lines and heads in the ceiling. That area was also served by an existing building fire protection system. A sprinkler head could be removed, by unscrewing the head from the plumbing line, without any damage to the sprinkler head or to the plumbing line. If sprinkler heads became inoperative, petitioner replaced them with new ones. Petitioner also moved and reused sprinkler heads when an area was reconfigured. Fire codes required that sprinkler heads be located a certain distance from walls. Thus, when an area was reconfigured, sprinkler heads were moved to conform to those requirements. Other sprinkler heads at issue include assets 973229-1, 973230-1, 973571-1, and 973597-1 (Midland); 975939 (N.W. Houston); and 2038079 (Attleboro). Security Fencing
Petitioner erected chain link fences that enclosed warehouse loading dock areas at *443 Lewisville and N.W. Houston to provide additional security for these areas, which contained components used in petitioner's activities and finished product (assets 975443 and 974067, respectively). The fences were within the fenced perimeter of the sites. Petitioner also erected a chain link fence that enclosed the Dallas Expressway truck parking facility, where transportation trucks and trailers that were used in petitioner's shipping operation were stored (asset 976636-2). Similarly, petitioner erected chain link fences that enclosed the fuel tanks and the water tanks at Forest Lane, Midland, and N.W. Houston (assets 975211, 975361, and 974578, respectively). No manufacturing took place inside the areas enclosed by these fences. The water tanks at Forest Lane and Midland were used exclusively for the fire protection systems at those sites, and the water tank at N.W. Houston was the sole water supply for the site. The fuel tanks provided emergency power for the boilers. The fences were erected to exclude unauthorized pedestrian or vehicular traffic, to prevent tampering with the valves, and to keep children from playing in the area surrounding the tanks. During the years *444 in issue, a fence ran along the entire perimeter of both the Midland and N.W. Houston sites, and the fences at issue were located within these exterior fences. Landscaping
Petitioner constructed, for aesthetic purposes, interior landscaping adjacent to break areas along the spines or connecting corridors in buildings at Johnson City, Lewisville, and Temple (assets 2179249, 975849, and 975266, respectively). The interior landscaping included potted plants, plants placed in planters in floor openings, and the landscaped rock and wood trim associated with the planters. The potted plants were readily movable. The plants in the interior planters were removed by digging them out. A plant was removed if it died or was replaced for aesthetic reasons, if excavation work was necessary, or if the floor opening was paved over. Most of the floor openings in the concrete slabs at these sites have remained in use for landscaping. Petitioner landscaped an earth berm at S.W. Houston (asset 974911). The earth berm was a mound of earth outside a concrete wall that surrounded a hydrogen tank on three sides. The berm was constructed to deflect any blast upwards and was landscaped to prevent *445 soil erosion. Electrical Equipment
Petitioner's electrical systems included, among other things, substations, bus ducts, switch gear, circuit breakers, transformers, motor starters, and associated wiring and cables. In general, petitioner claimed that the electrical assets at issue were eligible for the ITC because they were used to power manufacturing equipment, i.e., equipment that itself was eligible for the ITC, or were used in qualifying manufacturing processes. Except where otherwise indicated, petitioner claimed ITC based on 100 percent of the cost associated with an electrical system asset. To facilitate our analysis, we have set forth our findings by categories of assets denoted by the parties. Category One
An incoming high-voltage main substation that was installed as part of the power distribution for the entire Attleboro site (asset 2038082) reduced power from 23,000 volts to 5,000 volts to serve the precious metals processing building. Administrative offices in that building accounted for approximately 5 percent of the square footage therein. Two transformers and six motor starters were installed at the Dallas Central Utility Plant (CUP) (asset 973015) *446 to power the condenser water pumps that were part of the water chilling system that provided air conditioning to all rooms and spaces within the buildings. That system was also used to cool specific pieces of equipment and to chill chemical vapors produced in the processing of printing circuits. Approximately 60 to 65 percent of the output of the water chilling system was used in the cooling function. To provide power to the extension to Module J at N.W. Houston, petitioner installed a transformer (asset 975944), which related to the overall operation and maintenance of that building. Eighty percent of the electrical load carried by the following assets was used for machinery or equipment used in qualifying manufacturing processes and did not relate to the overall operation or maintenance of a building to that extent: (1) A substation that powered a facility at Attleboro where electric furnaces melted silver into ingots (asset 2038069); (2) a 480-volt bus duct from a substation that fed approximately one-third of the precious metals processing building at Attleboro (asset 2038283); and (3) a transformer that was installed to provide power for the heavy metals waste treatment plant, *447 for deionized water equipment, and for air compressors at S.W. Houston (asset 976232). One hundred percent of the electrical load carried by the following assets was used for machinery or equipment used in qualifying manufacturing processes and did not relate to the overall operation or maintenance of a building: (1) Three substations at Attleboro added to power equipment used in the buffing line room and other equipment used in manufacturing at that plant (assets 2039815, 2039847, and 2039924); (2) two substations that served a burn-in facility in manufacturing Module E at Johnson City (asset 2179115-4); (3) a substation installed at Austin to serve the computers that processed seismic data (asset 975535); (4) a 480-volt bus duct that provided electricity to four new infrared epoxy curing ovens at Attleboro (asset 2039930); (5) the electrical distribution system for a plating line at Austin (asset 974080); (6) electrical equipment used to test equipment and components designed to operate in aircraft at Forest Lane (assets 974135, 973769, and 974129); and (7) two 1,600-amp circuit breakers at Attleboro (assets 2038109 and 2001445). Category Two
Petitioner installed an electrical *448 breaker and feeder system that provided incoming high-voltage power to substations in a 666,000 square-foot area in the South Building at Dallas, where the power was then stepped down and distributed throughout the building (asset 974267). This system was added due to the increased capacity necessitated by the addition of clean rooms in the silicon wafer fabrication facility in that building. These rooms required a heavy power load to maintain the environment, and the additional power that this system brought into the building was not required at the time that it was installed to provide power for general building operations. A high-voltage switch gear and duct bank, and two transformers that stepped down the voltage from 23,000 volts to 12,470 volts, were added at Lubbock (assets 974470 and 974471). These assets were installed as a redundant system to provide power to the wafer fabrication facility in the particular section of the Lubbock plant that consisted of clean rooms and supporting operations in three Modules (F, G, and H). Those Modules had an aggregate space of 234,000 square feet. Module G was 49,000 square feet and included a 1,260-square-foot engineering library; *449 the balance of the space was for clean rooms and support equipment. Approximately 30,000 of the 49,000 square footage of Module H was an administrative area. The clean rooms in Modules F and G required high power loads to maintain the environment. Lower humidity and cooler temperatures were required in the clean rooms, relative to administrative areas. The new capacity provided by these assets was installed because of the vulnerability and cost associated with the loss of power to the wafer fabrication area. These assets supplied power for air-handling units, lights, vending machines, water fountains, and all of the other power needs of the wafer fabrication facility (except for heating and cooling, which came from the main mechanical room). They also served a 900-ton chiller that supplemented air-conditioning service to the entire Lubbock site. Electrical buses, wiring, and cable trays provided power throughout an addition to the Systems Integration Center at Austin (assets 974885 and 974888) for manufacturing equipment requirements and other general building requirements such as heating, ventilation, and air conditioning (HVAC), lighting, and nonmanufacturing equipment. *450 Petitioner estimated that approximately 90 percent of the Systems Integration Center was devoted to manufacturing and that 75 percent of the power used in the addition to that building was directly allocable to manufacturing equipment. An underground high-voltage distribution system (asset 2038152) powered the entire Attleboro plant, including all lighting, HVAC, and equipment in both the manufacturing and nonmanufacturing areas. Petitioner also installed at Attleboro a switch gear (asset 2038153) that controlled and distributed all of the incoming high-voltage electricity to the entire site. These components of the electrical distribution system at Attleboro were added to provide the additional capacity necessary for manufacturing equipment that was to be installed at the plant. Petitioner estimated that 80 percent of the electrical usage at the Attleboro plant was for manufacturing requirements. Petitioner also installed a substation at Midland to provide increased power for burn-in of military products (asset 975252). Some of the assets listed above (2038152, 2038153, 974267, 974470, and 974471) were "major site electrical assets". In general, these assets were components *451 of the incoming high-voltage electrical systems at the respective sites. The absence of these major site electrical assets would result in either the complete elimination of incoming high-voltage electrical power to the respective sites or a portion of a site or, in the case of so-called redundant systems, would completely eliminate the parallel source of incoming power. Category Three
Petitioner purchased spare circuit breakers and spare transformers (nondedicated spares), at least in part, so that it could restore power to a manufacturing area in the event of a power failure as quickly as possible. These nondedicated spares could have been used in any of the compatible substations at the respective sites, which served both manufacturing areas and areas that related to the operation or maintenance of the building. It was not possible to ascertain what percentage of the load potentially carried by these spares would have related to overall maintenance and operation of buildings and what percentage would have related to manufacturing equipment or other qualifying processes. Those nondedicated spares included assets 972617 (Austin); 975203 and 975204 (Forest Lane); 972668 *452 (Lewisville); 975533, 975533-1, 975533-2 and 975533-3 (N.W. Houston); and 974557 (S.W. Houston). Petitioner also purchased a cable (asset 974332) as a replacement for the main electrical feeder line at Temple that was damaged during installation. The replacement was purchased to avoid the possibility of a disruption of power (it normally took a minimum of 6 months to obtain replacement cable). If used, the cable would have served the entire site, i.e., administrative as well as manufacturing areas and all types of electrical equipment. Petitioner purchased other assets to maintain a continual power supply in the event of a power failure or failure of the original equipment either because of the high costs associated with a temporary loss of power in certain of its manufacturing areas or because of the amount of time required to acquire such replacements (or both). In each instance, these assets would have provided all the power to the respective buildings or sites, which included both manufacturing and nonmanufacturing areas. These assets included a cable system at Attleboro (asset 2039933); backup feed systems at Austin (asset 972671) and at Lewisville (asset 976083); and an *453 automatic rollover switch at S.W. Houston (asset 973902). Category Four
The final category of electrical equipment consists of additional substations, switch gear, and transformers. Petitioner installed two substations at Attleboro (assets 2038231 and 2038232). These substations (C and D) carried electrical loads used for general building operations and for air conditioning for manufacturing equipment in that building. Eighty percent of the electrical load from these two substations was used for machinery or equipment used in qualifying manufacturing processes and did not relate to the overall operation or maintenance of the building to that extent. A high-voltage switch gear (asset 975838-1) was installed principally to provide a redundant power feed to the CIC facility at Lewisville. The switch gear was located in the CUP and controlled and could provide power to the entire site. Petitioner also installed a substation in the CUP that powered cooling towers, condenser water pumps, and chilled water pumps at the Lewisville site (asset 975884-1). The substation could have powered all four chillers that provided chilled water to the entire Lewisville facility, but it was *454 installed (together with an extra chiller) to ensure that the CIC had the chilled water that was required for its air conditioning and operations. This additional chiller was used as part of the overall building cooling system. The cooling provided to the CIC module included space air conditioning as well as chilled water to the mainframe computers that controlled manufacturing operations at several of petitioner's sites. Petitioner determined that the portion of the use of the high-voltage switch gear (asset 975838-1) and of the substation (asset 975884-1) attributable to manufacturing was 73.8 percent, and petitioner treated that percentage of the total costs of the assets as eligible for the ITC. Two substations were installed in Modules H and J at N.W. Houston (assets 976010-1 and 976011-1). Petitioner estimated that 84 percent of the energy consumed in Modules H and J was consumed in manufacturing processes. Distribution panel HA operated from one of five breakers on substation H, and distribution panel JA operated from one of five breakers on substation J. It is not known what machinery or other operations were served by the other four breakers of each of the respective *455 substations. Transformers within distribution panels HA and JA included assets 976012-1, 976013-1, 976022, and 976023. Petitioner determined that the portion of the use of these assets (976010-1, 976011-1, 976012-1, 976013-1, 976022, and 976023) at the N.W. Houston plant attributable to manfacturing was 84.09 percent and treated that percentage of the total costs of the assets as eligible for the ITC. Finally, petitioner installed four substations at the S.W. Houston plant (assets 973764-1, 973764-2, 973764-3, and 973764-4). These substations were installed in an addition to Module A, a 120,000-square-foot facility that was constructed to provide products under an agreement with another party. Two of the substations were installed to provide power to heating and cooling equipment for the entire module, and two were installed to provide power for the manufacturing facilities that were to be installed in that module. No manufacturing equipment was ever installed in Module A, and these four substations have never been used to power manufacturing equipment. Petitioner determined that the portion of the use of assets 973764-1, 973764-2, 973764-3, and 973764-4 (S.W. Houston) attributable *456 to manufacturing was 80 to 85 percent. OPINION The ITC was added to the Internal Revenue Code in 1962 to "encourage modernization and expansion of the Nation's productive facilities" and to increase economic productivity, output, and growth by creating a tax incentive for the purchase of machinery, equipment, and other property used to produce goods or run a business. Illinois Cereal Mills, Inc. v. Commissioner, 789 F.2d 1234, 1236 (7th Cir. 1986), affg. T.C. Memo. 1983-469; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 717. The ITC was repealed by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 211(a), 100 Stat. 2085, 2166, effective (subject to transition rules) for property placed in service after December 31, 1985. Petitioner is entitled to an investment tax credit with respect to the assets in dispute only if those assets are "section 38 property". Section 38 property is defined in section 48(a)(1), which provides: (1) In general. -- * * * the term "section 38 property" means -- (A) tangible personal property * * *, or (B) other tangible property (not including a building and its structural components) *457 but only if such property -- (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services. * * *
The regulations define "tangible personal property" as follows: the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). * * * Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. * * * Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure * * * [Sec. 1.48-1(c), Income Tax Regs.] The term "tangible personal property" is not intended to be defined narrowly and includes "'Assets accessory to the operation of a business'". Whiteco Industries, Inc. v. Commissioner, 65 T.C. 664, 671 (1975) (quoting S. Rept. 1881, supra, 1962-3 C.B. at 858); see also Illinois Cereal Mills, Inc. v. Commissioner, supra at 1237. *458 In order to determine whether property is tangible personal property, we must first determine whether that property is a "building" within the meaning of section 1.48-1(e)(1), Income Tax Regs.Loda Poultry Co. v. Commissioner, 88 T.C. 816 (1987); Munford, Inc. v. Commissioner, 87 T.C. 463 (1986), affd. 849 F.2d 1398 (11th Cir. 1988). Where the movability of property is at issue, we examine whether that property is a "building" by determining whether the structure is inherently permanent. Moore v. Commissioner, 58 T.C. 1045 (1972), affd. per curiam 489 F.2d 285 (5th Cir. 1973). To fit the definition of a building within the meaning of section 1.48-1(c), Income Tax Regs., "an item of property must be an inherently permanent structure on the land." Moore v. Commissioner, supra at 1052. We apply the following six-part test, set forth in Whiteco Industries Inc. v. Commissioner, supra at 672-673, principally to determine whether property is tangible personal property: (1) Is the property capable of being moved, and has it in fact been moved? *459 * * * (2) Is the property designed or constructed to remain permanently in place? * * * (3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved? * * * (4) How substantial a job is removal of the property and how time-consuming is it? * * * (5) How much damage will the property sustain upon its removal? * * * (6) What is the manner of affixation of the property to the land? * * * Even if inherently permanent, property that is in the nature of machinery may qualify as tangible personal property. See Weirick v. Commissioner, 62 T.C. 446, 452-453 (1974). Section 38 property also includes "other tangible property". Sec. 48(a)(1)(B). Other tangible property must also be something other than a building, which is defined in section 1.48-1(e)(1), Income Tax Regs., as follows: The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales *460 space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.
This regulation provides a two-part test for determining whether a structure is to be classified *461 as a building. The "appearance test" generally requires a structure or edifice enclosing a space within its walls, and usually covered by a roof, and the "function test" generally requires the structure to provide shelter or housing, or to provide working, office, parking, display, or sales space, or to provide a similar function. Many courts, including this Court, emphasize the function of a structure to determine whether it is a building. See Munford, Inc. v. Commissioner, supra at 479-480, and cases cited therein. Other tangible property also does not include a structural component of a building. Section 1.48-1(e)(2), Income Tax Regs., provides, in part: The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, *462 including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. * * *
In Scott Paper Co. v. Commissioner, 74 T.C. 137, 183 (1980), we explained that regulation as follows: the effect of the final element of that same subparagraph, which reads "and other components relating to the operation or maintenance of a building," must be taken into account. That final element functions as a descriptive phrase intended to present the basic test used for identifying structural components. The preceding elements are examples of items which meet that test as a general rule. Items which occur in an unusual circumstance and do not relate to the operation or maintenance of a building should not be structural components despite being listed in section 1.48-1(e)(2), Income Tax Regs. * * *
See also Morrison Inc. v. Commissioner, 891 F.2d 857 (11th Cir. 1990), affg. T.C. Memo. 1986-129; Illinois Cereal Mills, Inc. v. Commissioner, 789 F.2d 1234 (7th Cir. 1986), affg. T.C. Memo. 1983-469. But see A.C. Monk & Co. v. United States, 686 F.2d 1058, 1065-1066 (4th Cir. 1982). *463 Section 1.48-1(e)(2), Income Tax Regs., also demonstrates that property may qualify as other tangible property even if it relates to the operation or maintenance of a building if it is specially installed to meet particular manufacturing requirements: However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. * * * [Sec. 1.48-1(e)(2), Income Tax Regs.]
Finally, property may qualify as section 38 property under section 48(a)(1)(B)(i) only if it is used as an integral part of one of the qualifying activities described in section 48(a)(1)(B)(i). Munford, Inc. v. Commissioner, 87 T.C. at 475. Section 1.48-1(d)(4), Income Tax Regs., provides: *464 Property is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity. Thus, for example, in determining whether property is used as an integral part of manufacturing, all properties used by the taxpayer in acquiring or transporting raw materials or supplies to the point where the actual processing commences (such as docks, railroad tracks, and bridges), or in processing raw materials into the taxpayer's final product, would be considered as property used as an integral part of manufacturing. * * * We now apply these governing principles to the assets within the various categories with respect to which petitioner claimed the ITC. Waste Treatment Facilities
Petitioner contends that the waste treatment facilities in question qualify as "other tangible property" under section 48(a)(1)(B). The parties' dispute is centered primarily around whether these structures are "buildings" within the meaning of section 1.48-1(e)(1), Income Tax Regs. Respondent also contends that the facilities are not an integral part of manufacturing within the meaning of section 1.48-1(d)(4), Income *465 Tax Regs.
Respondent offered the testimony of George C. Cushnie, Jr. (Cushnie), whom the Court recognized as an expert in waste water treatment engineering. Cushnie concluded (1) that petitioner's waste treatment facilities had the appearance of and function similar to manufacturing facilities and (2) that, although waste treatment is an integral part of petitioner's manufacturing operations, petitioner's facilities were not part of the waste treatment processes because they merely housed the processes and the workers and did not contribute to the processing of wastes. Because a determination that these structures are "buildings" within the meaning of section 1.48-1(e)(1), Income Tax Regs., would negate any further inquiry, we will first address this point. As discussed above, that regulation defines a "building" in terms of an "appearance test" and a "function test". The appearance test generally requires a "structure or edifice enclosing a space within its walls, and usually covered by a roof". Sec. 1.48-1(e)(1), Income Tax Regs. We have examined photographs and blueprints of the structures and have considered the testimony of the witnesses. These facilities are permanent *466 structures of substantial dimensions that enclose spaces surrounded by walls and covered by roofs. See Yellow Freight System, Inc. v. United States, 538 F.2d 790, 796 (8th Cir. 1976); Munford, Inc. v. Commissioner, supra at 481; sec. 1.48-1(e)(1), Income Tax Regs. We conclude that the waste treatment facilities resemble buildings. The function test generally requires the structure "to provide shelter or housing, or to provide working, office, parking, display, or sales space." Sec. 1.48-1(e)(1), Income Tax Regs. In Munford, Inc. v. Commissioner, supra at 480, we reiterated that the function test requires a determination of "whether the purpose of the structure at issue is a purpose ejusdem generis to the purposes described by example in section 1.48-1(e)(1), Income Tax Regs.". We also stated: In applying the functional test, a major focus of inquiry is whether the structure provides working space for employees which is more than merely incidental to the primary function of the structure. * * * In this regard, it is appropriate to consider both the quantity and quality of the human activity within the structure. *467 * * * [Id.]
But see L & B Corp. v. Commissioner, 862 F.2d 667, 672 (8th Cir. 1988), revg. 88 T.C. 744 (1987), in which the Court of Appeals stated that "a structure functions as a 'building' if it provides shelter for significant machine or animal activity or if it provides working space for humans." "It is difficult to draw the line between providing no working space and providing such a quantum of space for workers that the structure becomes a 'building'". Satrum v. Commissioner, 62 T.C. 413, 417 (1974). In an attempt to draw that line in the instant case, we believe that our decision in Vail Associates, Inc. v. Commissioner, 88 T.C. 1391 (1987), provides the closest analogy. In Vail Associates, Inc., the taxpayer designed and constructed a pumphouse to house and protect equipment it used to manufacture snow. The structure was a steel-beam-framed prefabricated structure bolted to a concrete slab. The pumphouse had two small rooms, one that contained a computer and another that contained a table, chairs, and a toilet. The pumphouse was garrisoned by one individual, the computer operator, *468 who worked on a regular basis within the pumphouse. That operator would also turn pumps and compressors on and off. Other individuals entered the pumphouse to perform maintenance or to use the facilities in the other small room. We concluded that the pumphouse was not a "building" because human activity in the pumphouse was "merely supportive of and ancillary to the primary functions" of the pumphouse, which were to house and protect the equipment. Vail Associates, Inc. v. Commissioner, supra at 1404. The facts in the instant case are not materially distinguishable from the facts in Vail Associates, Inc. In this case, petitioner constructed the waste treatment facilities to house and to protect the processing equipment, and the facilities were not constructed primarily to provide working space. At the Dallas facility, the walls were built around the equipment after it was installed, and the space between the pieces of equipment were narrow and cramped, as were the catwalks and grates at upper levels. There were no restrooms. At the S.W. Houston facility, the spaces between the equipment, between the equipment and the walls, and on the catwalks *469 were generally narrow. The floor space that was not used to house the equipment and walkways was used for a receiving dock for chemicals, a storage room for sulphur dioxide, and a small toilet room. At the time that it was constructed, there was no separate control room for the operator at the Dallas facility, who spent half of his shift at the facility. At the S.W. Houston facility, there was an enclosed area that contained a laboratory and control room in which a single operator controlled the waste treatment process. The other responsibilities of the operator at each of those facilities included such things as monitoring the automatic processes, maintaining an adequate supply of chemicals in those processes, and performing general or preventative maintenance where required. It is apparent that these functions performed by the operators were merely supportive of and ancillary to the primary function of the waste treatment facilities, which was to protect and house the processing equipment. Vail Associates, Inc. v. Commissioner, supra.Considering both the quantity and quality of the human activity in the waste treatment facilities in this case, we conclude *470 that, on balance, they did not provide work space for employees that was more than merely incidental to the primary function of the structure. Munford, Inc. v. Commissioner, 87 T.C. at 480. In this regard, also compare, e.g., Satrum v. Commissioner, supra at 417, with Sunnyside Nurseries v. Commissioner, 59 T.C. 113, 122 (1972). We have concluded that the waste treatment facilities resembled buildings but did not function as buildings; we therefore hold that they are not buildings within the meaning of section 1.48-1(e)(1), Income Tax Regs.
In their briefs, the parties also dispute whether the facilities were reasonably adaptable to other uses. We have previously noted the confusion surrounding the applicability of this test. See generally Munford, Inc. v. Commissioner, supra at 487-488 and cases cited therein; see also sec. 1.48-1(e)(1)(ii), Income Tax Regs. Considering the contexts in other cases in which that test has been applied and our conclusion that the facilities were not buildings, resolution of this dispute adds little to our analysis. To the extent relevant, however, we agree *471 with petitioner that the record supports the conclusion that these waste treatment facilities were not reasonably adaptable to other uses. We next consider whether the waste treatment facilities were used as an integral part of manufacturing within the meaning of section 48(a)(1)(B)(i). Section 1.48-1(d)(4), Income Tax Regs., provides that property is used as an integral part of a qualified activity "if it is used directly in * * * [manufacturing] and is essential to the completeness of * * * [manufacturing]." Giannini Packing Corp. v. Commissioner, 83 T.C. 526, 532-533 (1984). Petitioner argues that these structures were "inextricably related to the waste treatment processing systems." Respondent relies on Cushnie's conclusion that the facilities did not contribute to the processing of wastes to support her position that the facilities were not essential to those processes. Cushnie's conclusion that petitioner's facilities did not contribute to the treatment processing systems was based on his experience with similar systems that are operated outdoors without the protection provided by facilities such as those of petitioner. Cushnie testified, however, *472 that some freeze protection was necessary for the processing system at the S.W. Houston facility because of the neutralizing reagents that were used in the treatment processes. Similar problems would be experienced at the Dallas facility because of the caustic reagents used in that system and because some of the controls and the ultrafiltration system were to be located indoors. Based on that testimony and Cushnie's report, as well as the testimony of petitioner's employees, we found that the waste treatment processing systems could not be operated outdoors because of the potential problems with pipes and other equipment freezing. In this connection, we must consider whether the facilities were essential to the operation of the waste treatment processing systems as designed and constructed. That some of the equipment or the processing systems themselves could have been modified to operate outdoors effectively, or that other processing systems similar to petitioner's operated successfully outdoors, is not germane to our inquiry. Thus, because it was based primarily on these assumptions, we give little weight to Cushnie's conclusion that petitioner's facilities did not contribute *473 to the waste treatment processing systems. Other factors that support petitioner's contention that these facilities were used directly in, and were essential to the completeness of, petitioner's manufacturing operations are that: (1) The floors were constructed with concrete pads on which the various equipment was placed and which served to protect the equipment in the event of spills, (2) the floors were designed to serve as containment vehicles in the event untreated fluids flowed onto the floor, and (3) the facility protected the equipment from the sun and rain. Even though the facilities did not prevent condensation or dissipate heat from the equipment, we believe that the facilities are akin to the pumphouses in Vail Associates, Inc. v. Commissioner, 88 T.C. 1391 (1987), which we concluded were an integral part of manufacturing within the meaning of section 1.48-1(d)(4), Income Tax Regs. See also Fort Howard Paper Co. v. Commissioner, T.C. Memo. 1977-422. We therefore conclude that the waste treatment facilities at Dallas and S.W. Houston are other tangible property within the meaning of section 48(a)(1)(B)(i). Drywall Partitions *474 Petitioner does not contend that the drywall partitions, which could not be reused upon their removal, are tangible personal property or that they are not structural components of a building. Rather, petitioner's position is that the drywall partitions qualify for the ITC as "other tangible property" within the meaning of section 48(a)(1)(B)(i). Petitioner contends that these drywall partitions, along with the ceilings and floors, were used to create rooms or structures that qualify as eligible property because they housed property "used as an integral part of manufacturing" and were "so closely related to the use of the property used in manufacturing" that they could be "expected to be replaced when the property was replaced." Petitioner also contends that some of the drywall partitions qualify for the ITC because they were installed for security reasons. Respondent offered the testimony of T. Patrick Luna (Luna), whom the Court recognized as an expert in architectural engineering. Luna testified with respect to the remaining categories of assets, except the electrical assets. We decline to set forth separately his conclusions with respect to those categories, although we have *475 considered and given due weight to each of his conclusions. Petitioner relies on various cases, including Brown-Forman Distillers Corp. v. United States, 205 Ct. Cl. 402, 499 F.2d 1263 (1974), Satrum v. Commissioner, 62 T.C. 413 (1974), Central Citrus Co. v. Commissioner, 58 T.C. 365 (1972), and Stuppy, Inc. v. United States, 454 F. Supp. 1378 (W.D. Mo. 1978), for the proposition that "property such as the drywall at issue qualifies as eligible section 38 property if it helps to maintain the environmental condition in an area." In each of those cases, the Court determined that the structures were "other tangible property" because they were not "buildings" within the meaning of section 1.48-1(e)(1), Income Tax Regs., and were used as an integral part of production processes within the meaning of section 1.48-1(d)(4), Income Tax Regs. In Satrum and Central Citrus Co., we examined the nature of the activity within the structures themselves to determine whether they were buildings and whether the structures could be economically used for any purpose other than that for which they were *476 specially designed, i.e., "reasonable adaptability." Central Citrus Co. v. Commissioner, supra at 371-372. See also sec. 1.48-1(e)(1)(ii), Income Tax Regs. In these key respects, we agree with respondent that the structures in this case are unlike those in the cited cases. The structures in this case enclosed areas that provided work space for its employees. Petitioner does not contend, and we cannot find, that the amount or the nature of the work performed in any of these areas was "merely supportive of, and ancillary to" the production work performed therein. Compare Satrum v. Commissioner, supra at 417. To the contrary, it was apparent from the testimony that the human activity in the clean rooms, computer rooms, and the other manufacturing rooms was essential to the manufacturing activities therein. Thus, these structures functioned as buildings. Munford, Inc. v. Commissioner, 87 T.C. at 480. Although we have indicated that an inquiry into the reasonable adaptability of a structure is not always significant, we discuss this factor here because of its importance in the cases upon which petitioner relies *477 and because it is a factor to be considered in determining whether a structure is within the second exception to the definition of a building. See sec. 1.48-1(e)(1)(ii), Income Tax Regs. In this case, some of the drywall partitions were coated with enamel or plastic and some contained a sound blanket. There is no other evidence, however, to support the conclusion that these drywall partitions were so specialized or were used, in part, to construct rooms that were so specialized that they could not reasonably be adapted to other uses. Compare, e.g., Munford, Inc. v. Commissioner, 87 T.C. at 487-488. Rather, we have found that these drywall partitions generally did not possess any special or unique qualities in that the filtering or environment control functions in the structures created with these drywall partitions were performed by air-handling or HVAC equipment. Also, although many of the rooms continued to be used for the purpose for which they were installed, in one instance, where the use of a computer room was discontinued, the room was subsequently used for other purposes. We are not persuaded that the structures are not "reasonably adaptable" to, *478 and could not economically be used for, other purposes. Sec. 1.48-1(e)(1)(ii), Income Tax Regs.
Thus, the record does not support petitioner's assertion that the structures were so closely related to the use of property within that the structures could be expected to be replaced when such property was replaced. See sec. 1.48-1(e)(1)(ii), Income Tax Regs. For these reasons, the cases cited and relied on by petitioner are distinguishable, and we do not reach the question of whether these structures were an integral part of manufacturing. We therefore conclude that these structures are not property eligible for the ITC. We reach the same conclusion with respect to drywall used to build structures that petitioner asserts qualify because they were created for security reasons. Petitioner did not establish that they did not provide work space or that they were within either of the exceptions to that term within the meaning of section 1.48-1(e)(1), Income Tax Regs.
Miscellaneous Structures and Related Equipment
Petitioner contends that the metal structure that housed the electrical switch gear at Attleboro and the structure that housed the fire protection system water pumps *479 at Lewisville are other tangible property because they housed property used as an integral part of manufacturing. Respondent contends that these structures were not related to the equipment they housed. The Attleboro structure was constructed to house and protect the electrical switch gear. There was a desk and file cabinet in the structure, but no employees were assigned to it and it otherwise provided no work space. The unoccupied space therein was to allow for access to and removal of equipment. Scott Paper Co. v. Commissioner, 74 T.C. at 182. Also, it is not apparent that this specially constructed steel structure, which had large holes in the floor through which electrical cables passed, could be reasonably adaptable to other uses on the removal of the switch gear. The electrical switch gear powered manufacturing areas and was thus used in an activity specified in section 48(a)(1)(B)(i). We therefore conclude that this structure is not a building within the meaning of section 1.48-1(e)(1)(ii), Income Tax Regs., and is other tangible property eligible for the ITC. In contrast, the water tank and pumps housed in the Lewisville pump structure were part *480 of the fire protection system for the entire Lewisville site, and the fire protection system would have been required regardless of whether any manufacturing activity was conducted in any of the buildings at that site. Because petitioner did not establish that this was used in connection with any particular manufacturing or other qualifying activity within the meaning of section 1.48-1(d)(4), Income Tax Regs., we cannot conclude that this structure is other tangible property eligible for the ITC. Sec. 48(a)(1)(B)(i). Petitioner also contends that the water tank and the fuel oil tank at Lewisville are qualified property, citing Northville Dock Corp. v. Commissioner, 52 T.C. 68 (1969), affd. per curiam 427 F.2d 164 (2d Cir. 1970), and Rev. Rul. 74-204, 1974-1 C.B. 12, and that the water pumps housed in the Lewisville structure are qualified property, citing Rev. Rul. 69-273, 1969-1 C.B. 30. These assets were included in the costs associated with the Lewisville pump structure. Thus, petitioner has not established the cost of these assets for purposes of determining the basis upon which the *481 ITC is computed. In any event, the authorities cited by petitioner are distinguishable and do not support its contention. In Northville Dock Corp. v. Commissioner, supra, the taxpayer placed in service two fuel oil storage tanks. We concluded that tank 1 was a storage facility "used in connection with" a qualifying activity because it was used to store and manufacture a particular grade of oil. See sec. 1.48-1(d)(1) and (2), Income Tax Regs. To the same effect is Rev. Rul. 74-204, supra. Tank 2 was "substantially used" to store leased oil for various oil refineries and was therefore a storage facility "used in connection with" manufacturing within the meaning of section 1.48-1(d)(1), Income Tax Regs.Northville Dock Corp. v. Commissioner, supra at 76. In this case, the water storage tank was not used in connection with any qualified activity. The 161,000-gallon fuel oil tank was part of a backup power supply system to the primary gas supply for the operation of the boilers. We could not find on this record that the boilers, which were also used to heat all of the buildings, were "substantially *482 used" to provide hot water for humidification required for certain manufacturing areas, which distinguishes this fuel oil tank from the tanks in Northville Dock Corp. v. Commissioner, supra.Similarly, petitioner did not establish how the fuel oil tank at Johnson City was used. We therefore cannot conclude that the containment area for that tank qualifies for the credit because it was "integrally related" to the tank itself. Sec. 1.48-1(d)(1), (4), Income Tax Regs.; compare Rev. Rul. 72-96, 1972-1 C.B. 67. Petitioner contends that the other structures described in this category of our findings qualify for the ITC for the same reasons that the drywall partitions used as components in the construction of its clean rooms and computer rooms qualify, namely that they "were designed to alter or control critical environmental conditions." Respondent contends that these structures are not other tangible property because they provided working space, were reasonably adaptable to other uses, and were not an integral part of manufacturing within the meaning of section 1.48-1(d)(4), Income Tax Regs.
Petitioner argues that the 5,000-square-foot *483 extension to Module J at the N.W. Houston plant qualifies because it "was not designed for employee comfort" and "there was no restroom, office space, or separate work space." Respondent argues that it was merely a "dock" that provided work space. The amount of actual working space that this structure provided is not clear. It was designed to outfit trucks with certain seismic equipment, which would require that adequate space be provided for workers to perform that task. The record does not support the conclusion that that work was "merely supportive of and ancillary to" the function of this structure. Vail Associates, Inc. v. Commissioner, 88 T.C. at 1404. We thus cannot conclude that it did not provide for employee work space that was more than merely incidental to the function of the structure. Munford, Inc. v. Commissioner, 87 T.C. at 480. That the temperature had to be regulated in that structure does not negate the conclusion that necessarily follows, namely, that this extension is a "building" within the meaning of section 1.48-1(e)(1), Income Tax Regs.
Further, the extension was never used to outfit trucks. Petitioner filled *484 in the lower portion of the area and used it for storage and as a repair facility. Many of the assets initially installed therein have remained in place. These subsequent alterations indicate that it was reasonably adaptable to other uses and thus not so closely related to the property used within the extension that the extension could be expected to be replaced when that property was replaced. Sec. 1.48-1(e)(1)(ii), Income Tax Regs. In light of the above, we conclude that this extension is not "other tangible property" within the meaning of section 48(a)(1)(B)(i). Petitioner also contends that the laboratory in Building 10 at Attleboro and the bonding mill room inside Building 3 at Attleboro are other tangible property. The laboratory was a 1,600-square-foot room within which three smaller rooms were constructed. Seven or eight employees regularly worked in the laboratory area itself. In short, we are not persuaded that these structures did not provide for employee work space that was merely incidental to the primary function of the structures, Munford, Inc. v. Commissioner, supra at 480; Satrum v. Commissioner, 62 T.C. at 417, *485 or that they were not reasonably adaptable to other uses. Satrum v. Commissioner, 62 T.C. at 416-417; Central Citrus Co. v. Commissioner, 58 T.C. at 369-370. We therefore conclude that they are not "other tangible property" eligible for the ITC. Finally, because we concluded in our discussion of the drywall partitions that the buffing line room at Attleboro and the roller, stretcher, and leveler room in Building 4 at Attleboro were not "other tangible property" eligible for the ITC, the assets in addition to the drywall partitions that were used to construct those rooms are not eligible for the ITC. Floors
Petitioner's position is that the floors at issue "functioned essentially as an item of machinery or equipment." Petitioner cites Rev. Rul. 79-181, 1979-1 C.B. 41, and Rev. Rul. 79-183, 1979-1 C.B. 44, and argues that the supporting columns and the composite concrete floor at the Sherman Saw building and the process floor in the anechoic chamber at Lewisville resemble the assets in those rulings. Respondent's position is that those floors are structural components within the *486 meaning of section 1.48-1(e)(2), Income Tax Regs.
Section 1.48-1(c), Income Tax Regs., provides that tangible personal property includes property "which is in the nature of machinery". In Rev. Rul. 79-181, supra, respondent determined that structural columns that were specifically designed to support 400-ton cranes and craneway structures were tangible personal property because they functioned as part of the specific items of machinery with which they were associated and "Any function they may have as building components is strictly incidental to their essential function as a part of those items of machinery or equipment." Rev. Rul. 79-181, supra at 42. Similarly, in Rev. Rul. 79-183, supra, a foundation that was specially constructed to support several stamping presses was an essential part of that machinery. Although the foundation also served as a floor, that use was "strictly incidental to the use that necessitated its special design." Rev. Rul. 79-183, supra at 45. We applied a similar approach in Weirick v. Commissioner, 62 T.C. 446 (1974), *487 where we concluded that certain cable support and hold down towers used in the operation of a ski lift were section 38 property. The towers served either to support or anchor the lift cable and were so closely related to other parts of the ski lift, which were in the nature of machinery, that we held that they were "designed as a unitary mechanism" with those other machinery parts. Weirick v. Commissioner, supra at 454. Also, from a "functional standpoint", those other machinery parts could not function without the towers. Id.
In this case, the main concrete floor at the Sherman Saw building was specially designed and constructed as a composite floor system to support the silicon saws and lappers, which was an efficient design for supporting heavy loads and reducing deflection. In the floor itself, a reinforced concrete slab was constructed integrally with structural steel floor beams to support the load. The floor was supported by the concrete columns that extended from the basement floor to the main concrete floor itself and by the concrete columns that extended from the basement floor through the main concrete floor to the roof. We are convinced *488 that this specially designed floor was essential to the operation of the saw and lappers. Also, because the composite floor was designed and constructed to cover the entire area throughout the building to allow for expansion of the saw and lapper areas, it is not dispositive that as much as two-fifths of the floor was used for activities that did not involve heavy machinery. In this sense, to the extent that it also served as a floor, this use "is strictly incidental to the use that necessitated its special design." Rev. Rul. 79-183, supra at 45. We therefore conclude that the supporting columns and the composite concrete floor at the Sherman Saw building are tangible personal property. We are not persuaded, however, that the concrete ground floor in the support module that contained the anechoic chambers at Lewisville qualifies as section 38 property. Although not at issue, it is not clear that the anechoic chambers themselves were qualifying structures or property in the nature of machinery or equipment. Compare, e.g., Lukens, Inc. v. Commissioner, T.C. Memo. 1987-464. Further, although this 8-inch concrete slab was thicker *489 than the 5- to 6-inch floors petitioner constructed in other modules, it was of standard construction. Thus, it was not so specially designed, constructed, or used to serve other qualifying property such that the latter property could not function without it. Weirick v. Commissioner, supra at 446; cf. Morrison Inc. v. Commissioner, T.C. Memo. 1986-129, affd. 891 F.2d 857 (11th Cir. 1990). We therefore conclude that this floor related to the operation or maintenance of a building and is a "structural component" within the meaning of section 1.48-1(e)(2), Income Tax Regs.
Petitioner also contends that the wood deck in the support module at Lewisville qualifies as section 38 property "because it was designed to provide access to the anechoic chambers". This wood deck was constructed at ground level and covered the entire module. Thus, although it provided employee access to the anechoic chambers, it also provided access and work space for the entire module. Also, it did not provide structural support for equipment in the module and it was not established that it was an essential part of any specific items of machinery *490 or equipment. Compare Rev. Rul. 74-391, 1974-2 C.B. 9, upon which petitioner relies. On these facts, we conclude that this wood deck related to the operation or maintenance of a building and is a "structural component" within the meaning of section 1.48-1(e)(2), Income Tax Regs.
Windown Walls
Petitioner contends that the window walls installed primarily in the spine areas are section 38 property because they were not inherently permanent and "are similar to the partitions identified as qualifying section 38 property in " Minot Federal Savings & Loan Association v. United States, 435 F.2d 1368 (8th Cir. 1970), and King Radio Corp. v. United States, 486 F.2d 1091 (10th Cir. 1973). Respondent contends that the window walls are not tangible personal property because they "functioned as permanent components of the spine areas" and are therefore structural components of the buildings. Section 1.48-1(e)(2), Income Tax Regs., defines structural components to include "such parts of a building as walls, [and] partitions". The terms "walls" and "partitions" as used in that regulation mean inherently permanent walls *491 and partitions. Minot Federal Savings & Loan Association v. United States, supra at 1371; King Radio Corp. v. United States, supra at 1095. If these items "occur in an unusual circumstance" and do not "relate to the operation or maintenance of a building", however, they are not structural components of a building within the meaning of that regulation. Scott Paper Co. v. Commissioner, 74 T.C. at 183. The window walls were capable of being moved and have been moved on occasion in connection with space configurations. Except for slight scarring of the floor, there was no damage to the windows, to the floor, or to the building when the window walls were removed. We reiterated in Metro National Corp. v. Commissioner, T.C. Memo. 1987-38, however, that movability is only one characteristic to be considered in determining whether property is a structural component, citing Everhart v. Commissioner, 61 T.C. 328, 331 (1973), and Kramertown Co. v. Commissioner, 488 F.2d 728, 731 (5th Cir. 1974), affg. T.C. Memo. 1972-239. In that case, we considered *492 the Whiteco ( Whiteco Industries, Inc. v. Commissioner, 65 T.C. 664 (1975)) factors in determining that partitions and ceilings were structural components. The window walls in this case were not necessarily readily movable in that petitioner generally hired subcontractors to move them and removal would take upwards of a half day. Cf. Mallinckrodt, Inc. v. Commissioner, T.C. Memo. 1984-532, affd. per curiam 778 F.2d 402 (8th Cir. 1985). Also, the window walls generally remained in place and were, as petitioner acknowledges, installed "to create hall space" in the spines of the buildings and to provide separation, access, a barrier from noise transmission, a degree of security, and a pleasing architectural effect. In this respect, the window walls are different from the partitions in Minot Federal Savings & Loan Association v. United States, supra, and King Radio Corp. v. United States, supra, which were used to accommodate the desires of the tenants in the buildings or in a portion of the taxpayer's building that was not divided into individual offices and work areas by fixed *493 walls or partitions. See also Metro National Corp. v. Commissioner, supra.Thus, these window walls did not "occur in an unusual circumstance" but rather "related to the operation or maintenance of a building". Scott Paper Co. v. Commissioner, supra at 183. We find further support for this differentiation in the Senate Finance Committee report accompanying the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2767, wherein that Committee clarified that certain property was already eligible for the ITC, including movable and removable partitions that had "no more than an incidental relationship to the operation or maintenance of a building". S. Rept. 95-1263 (1978), 1978-3 C.B. 321, 415. The window walls in this case had more than an "incidental relationship" to the overall operation or maintenance of a building in that removal would detract significantly from the operation of the building. Cf. Morrison Inc. v. Commissioner, T.C. Memo. 1986-129, affd. 891 F.2d 857 (11th Cir. 1990). Given this relationship to the operation of the building, the window walls are structural components *494 "in the ordinary and everyday sense of that word". King Radio Corp. v. United States, 486 F.2d at 1095. We therefore conclude that these window walls are structural components of a building within the meaning of section 1.48-1(e)(2), Income Tax Regs.
Ceilings
Petitioner first contends that certain of the ceilings qualify for the ITC because they were used to create structures analogous to the "sweet rooms" described in Central Citrus Co. v. Commissioner, 58 T.C. 365 (1972), and to the structure in Brown-Forman Distillers, Corp. v. United States, 205 Ct. Cl. 402, 499 F.2d 1263 (1974). We reject this argument for the same reasons that we rejected it as applied to the drywall partitions. Therefore, the suspended ceilings that were installed as part of the construction of the clean rooms, computer rooms, and other controlled environment structures are not other tangible property within the meaning of section 1.48-1(e)(1), Income Tax Regs.
Petitioner contends that the other ceilings at issue were readily movable and qualify for the ITC as tangible personal property. Petitioner argues that the ceilings *495 satisfy each of the criteria established in Whiteco Industries, Inc. v. Commissioner, 65 T.C. 664 (1975), and were not inherently permanent. Petitioner also argues that the ceilings are similar to the partitions identified as section 38 property in Minot Federal Savings & Loan Association v. United States, 435 F.2d 1368 (8th Cir. 1970), and King Radio Corp. v. United States, 486 F.2d 1091 (10th Cir. 1973). Respondent argues that the ceilings are structural components of buildings within the meaning of section 1.48-1(e)(2), Income Tax Regs.
As discussed above, movability is only one characteristic to be considered in determining whether property is a structural component. The taxpayer in Metro National Corp. v. Commissioner, T.C. Memo. 1987-38, claimed the ITC for "false" ceilings that were moved to meet the needs of the tenants in the taxpayer's buildings at any particular time. These ceilings consisted of metal T-strips suspended from the bare ceiling and in which acoustical ceiling tiles or fluorescent light panels of the same dimensions were placed. We held that those ceilings related to the operation *496 of the building and were "ceilings" within the meaning of section 1.48-1(e)(2), Income Tax Regs.
We discern no significant distinctions between those ceilings and the ceilings in the instant case. The suspended ceilings had openings for sprinkler heads, lay-in lighting, and diffusers for air conditioning, and the ceiling grid supported the lighting system; the panels were laid horizontally into the metal grid. Similarly, utility lines, including water lines and compressed air lines, ran above the tectum ceilings installed in the spines of certain of petitioner's buildings. We believe that these ceilings were designed to be a permanent part of the buildings and that their removal would affect the operation of the buildings in which they were installed. See Morrison Inc. v. Commissioner, supra. Petitioner used these suspended and tectum ceilings in spines, conference rooms, cafeterias, kitchens, restrooms, lobbies, offices, and break areas. Except in connection with space reconfiguration or temporary removal for access to overhead utilities, these ceilings have typically remained in place. Thus, they had more than "an incidental relationship to the operation or maintenance *497 of a building". S. Rept. 95-1263 (1978), 1978-3 C.B. 321, 415. We conclude that they are "ceilings" within the meaning of section 1.48-1(e)(2), Income Tax Regs., and are therefore structural components not eligible for the ITC. Air Conditioning
Respondent contends that the air-conditioning unit petitioner installed in the telephone room at Lewisville is not section 38 property because it "related to a building function, namely communications for the entire site." Generally, such an air-conditioning unit would be considered a structural component of a building within the meaning of section 1.48-1(e)(2), Income Tax Regs. See, e.g., Kramertown Co. v. Commissioner, 488 F.2d 728 (5th Cir. 1974), affg. T.C. Memo. 1972-239. The sole justification for the installation of this unit, however, was to ensure that the heat-sensitive telephone equipment in that room, which would not operate if the temperature reached a certain level, would continue to operate in the event of a cooling or plant power failure. The emergency unit did not support any other part of the building. Thus, the unit qualifies as tangible personal property rather *498 than as a structural component because it was machinery installed only to "meet temperature or humidity requirements which are essential for the operation of other machinery". Sec. 1.48-1(e)(2), Income Tax Regs.; see Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739, 750-753 (1985), affd. 803 F.2d 1572 (11th Cir. 1986); Morrison Inc. v. Commissioner, T.C. Memo. 1986-129, affd. 891 F.2d 857 (11th Cir. 1990). Plumbing
The plumbing lines remaining in issue in this case served only equipment or machinery used in manufacturing processes. See Central Citrus Co. v. Commissioner, 58 T.C. 365, 374 (1972). Because they did not relate to the operation or maintenance of the buildings in which they were located, we conclude that these plumbing lines are not structural components of the building within the meaning of section 1.48-1(e)(2), Income Tax Regs., and qualify as section 38 property. Scott Paper Co. v. Commissioner, 74 T.C. at 183; Morrison Inc. v. Commissioner, supra.
Emergency Doors
Petitioner asserts that the six doors installed in the CIC *499 building qualify for the ITC "Because they were installed to provide additional security." Although the interior metal doors did provide some additional security to the CIC building, they were not installed for this purpose. As petitioner's employee testified, these interior doors (like the outside doors) were "installed to provide emergency egress from the building for the employees that would be in the building." There is no basis to distinguish these doors from those that are specifically mentioned as structural components of a building in section 1.48-1(e)(2), Income Tax Regs., or from the other emergency doors that were installed throughout the rest of the building. These doors are permanent features of the CIC module and were necessary to provide safe passage for petitioner's employees in the event of an emergency. Emergency doors are required in virtually every factory or office building; thus, removal of the doors would detract significantly from the operation and maintenance of the building. Compare Morrison Inc. v. Commissioner, supra. We therefore conclude that these doors are structural components of the building and thus do not qualify for the ITC. Fire *500 Protection Systems
Petitioner contends that some of the fire protection systems, namely those that were installed in the duct work in the buffing line room at Attleboro, in the duct work of the chemical exhaust systems at Attleboro, and in the Temple warehouse, qualify for the ITC because they were "dedicated" to manufacturing. Because petitioner does not contend that these systems are movable and not inherently permanent property, we must determine whether they are "other tangible property" within the meaning of section 48(a)(1)(B). Respondent contends that each of the systems at issue was part of the general building fire protection systems and each was thus a structural component. She argues that "the requisite functional nexus to manufacturing is simply lacking" and cites Ponderosa Mouldings, Inc. v. Commissioner, 53 T.C. 92 (1969). In Ponderosa Mouldings, Inc., the taxpayer installed a fire protection system in all portions of its plant, including areas such as storage sheds, an office building, and sorting sheds where no actual manufacturing took place. Giving due weight to the inclusion of "sprinkler systems" in section 1.48-1(e)(2), Income Tax *501 Regs., and because the system was installed throughout the entire plant and thus related to the operation or maintenance of the building, we concluded that that system was a structural component not eligible for the ITC. Petitioner, unlike the taxpayer in Ponderosa Mouldings, Inc., has not claimed the ITC for the general building fire protection systems. Instead, it limited its claim to those systems that it contends are integrally related to specific manufacturing activities. The systems in the exhaust system duct work and booths at the buffing line and in the duct work of four chemical exhaust systems at Attleboro were installed in addition to the existing general building systems and provided localized fire protection to specific manufacturing processes. In the case of the fire protection system in the chemical exhaust systems, the heads could be triggered before the general building system. They did not relate to the operation or maintenance of the building, but rather to those specific manufacturing processes. See Scott Paper Co. v. Commissioner, 74 T.C. at 183-184; Central Citrus Co. v. Commissioner, 58 T.C. at 374; sec. 1.48-1(e)(2), *502 Income Tax Regs. We also reject respondent's assertion that these particular systems do not meet the standards prescribed in section 1.48-1(d)(4), Income Tax Regs. These systems were used to protect the specific manufacturing processes to which they related, and we conclude that they are other tangible property within the meaning of section 48(a)(1)(B). We reach a contrary conclusion with respect to the systems installed at the Temple warehouse. One of the systems was installed in an area that contained carousel storage racks. This area was located beneath a mezzanine that formed a floor and thus prevented the building system from protecting this area. General building practice dictated that a sprinkler system be installed in such areas. Thus, the system installed beneath that floor related to the overall operation or maintenance of the building. Also included in the costs associated with this system was the system that was installed in the foam hoods at the Temple warehouse. We have examined the capital authorization request, however, and are unable to determine what portion of the costs was attributable to that system. Therefore, even if it was qualified property, petitioner *503 is not entitled to the ITC because it has not established the costs associated therewith. Petitioner contends that the remaining assets are tangible personal property within the meaning of section 48(a)(1)(A). Petitioner argues that the removable sprinkler heads qualify because they were "not designed to remain permanently in place". In Metro National Corp. v. Commissioner, T.C. Memo. 1987-38, we concluded that the taxpayer's sprinkler heads, which could be easily removed, were not tangible personal property because they were "inseparable from, and give utility to, the underground pipes. The underground water system is an 'inherently permanent structure' * * *. The sprinkler heads are essential, detachable parts of that system and they relate to its operation under the principles of" section 1.48-1(e)(2), Income Tax Regs.
We are unable to discern any grounds that would serve to distinguish these sprinkler heads from those in Metro National Corporation v. Commissioner, supra. Petitioner does not contend that the fire protection systems to which the sprinkler heads at issue were attached are not inherently permanent, and they appear *504 to be equally essential to those systems. Also, other than to replace heads that were defective, they were removed generally only when petitioner reconfigured a room. They would then be installed back into the pipe at a distance from the wall that would satisfy fire code requirements. These heads and associated lines related to the operation or maintenance and were structural components of a building within the meaning of section 1.48-1(e)(2), Income Tax Regs. We therefore conclude that these assets, as well as the jockey pump that served the entire fire protection system at Forest Lane, are not tangible personal property within the meaning of section 48(a)(1)(A). In sum, only the fire protection systems installed in the duct work at Attleboro are eligible section 38 property. Security Fencing
Respondent contends that the fences at issue do not constitute property "used directly in", and were not "essential to the completeness of", a qualifying activity within the meaning of section 1.48-1(d), Income Tax Regs. The chain link fences that enclosed warehouse loading dock areas at the Lewisville and N.W. Houston plants were erected in those areas in addition to fences that *505 surrounded the perimeter of the sites. Because they provided security for those areas where petitioner stored components that it used in its manufacturing activities and finished product from those activities, we conclude that these fences were an integral part of petitioner's manufacturing activities at those sites and are other tangible property within the meaning of section 48(a)(1)(B)(i). See Spalding v. Commissioner, 66 T.C. 1017 (1976). Similarly, we conclude that the chain link fence that enclosed the Dallas Expressway truck parking facility, where transportation trucks and trailers that were used in petitioner's shipping operation were stored, is other tangible property. Cf. Yellow Freight System, Inc. v. United States, 413 F. Supp. 357 (W.D. Mo. 1975), revd. on other grounds 538 F.2d 790 (8th Cir. 1976); Rev. Rul. 71-555, 1971-2 C.B. 65. We also reject respondent's assertion that there is no relationship between the manufacturing activities at the Forest Lane, Midland, and N.W. Houston plants and the fences erected around the water tanks and the fuel tanks, which provided emergency power *506 for boilers used in manufacturing activities. Also, the water tank at N.W. Houston was the sole water supply for the entire site. The fences were erected to exclude unauthorized pedestrian or vehicular traffic, to prevent tampering with the valves, and to keep children from playing in the area surrounding the tanks. See Spartanburg Terminal Co. v. Commissioner, 66 T.C. 916, 938-940 (1976). We conclude that these fences were an integral part of petitioner's manufacturing activities at those sites and are other tangible property within the meaning of section 48(a)(1)(B)(i). Landscaping
Petitioner contends that the interior landscaping, which included potted plants, plants placed in planters in floor openings, and the landscaped rock and wood trim associated with the planters, is tangible personal property because those items were movable. Respondent does not dispute that the smaller potted plants are tangible personal property, but contends that the "larger plants" in the floor openings are "a different kind of asset" because they are inherently permanent and are structural components of a building. Most of the floor openings have remained in use for *507 landscaping; petitioner asserts, however, that only the plants in those openings are tangible personal property. A plant could be removed by digging it out of the interior planter and thus would cause no damage to the building. A plant was removed if it died or was replaced for aesthetic reasons, if excavation work was necessary, or if the floor opening was paved over. These interior plants were not inherently permanent. Whiteco Industries, Inc. v. Commissioner, 65 T.C. 664, 672-673 (1975). These plants were installed for aesthetic reasons and did not relate substantially to the operation or maintenance of the building. We therefore conclude that they are tangible personal property eligible for the ITC. Compare Duaine v. Commissioner, T.C. Memo. 1985-39, with Shoney's South, Inc. v. Commissioner, T.C. Memo. 1984-413. Petitioner contends that the landscaping at the S.W. Houston plant, the purpose of which was to prevent erosion of the earth berm surrounding the hydrogen tank, is qualified property, citing Rev. Rul. 68-347, 1968-2 C.B. 33. In that ruling, respondent determined that the taxpayer's *508 operation of an oil refinery was a qualifying activity as described in section 1.48-1(d)(1), Income Tax Regs., and that concrete fire-dike walls that it built around the oil storage tanks were "used directly in and essential to the completeness of" that activity. Rev. Rul. 68-347, supra at 34. Here, however, petitioner has not established how the hydrogen tank was used and, thus, that it was used "directly in" and was "essential to the completeness of" its manufacturing activities within the meaning of section 1.48-1(d)(4), Income Tax Regs. We therefore cannot conclude that the landscaping on the earth berm that was built outside a concrete wall that surrounded that tank on three sides was used as an integral part of manufacturing within the meaning of section 1.48-1(d)(1), Income Tax Regs. This landscaping is not other tangible property as described in section 48(a)(1)(B)(i). Electrical Equipment
Petitioner's position is that it is entitled to the ITC that it claimed on the disputed electrical assets in the following circumstances: (1) if the electrical equipment powered only specific items of machinery or equipment or only incidentally *509 served non-manufacturing needs; (2) if the electrical equipment was installed to provide additional capacity required by increased manufacturing demands; (3) if the electrical equipment served as a spare or provided backup or redundant power; or (4) if an allocable portion of the electrical equipment powered machinery or equipment.
As with the other assets at issue, petitioner presented the testimony of various key employees at each of the sites where the electrical assets were located to establish that they are section 38 property. These witnesses were not testifying as experts in electrical engineering, and petitioner did not offer the testimony or report of any expert in that field. In nearly every instance, these witnesses were not testifying based upon any written analysis or documentation of the electrical load used by a particular category of consumptive device. Where the witnesses were testifying based upon such documentation, however, it was generally not made available to respondent or to the Court or was not sufficiently explained. Rather, the testimony of the witnesses was based solely upon their familiarity or "first-hand knowledge" of the site. Respondent presented *510 the testimony and report of Junius A. Thomson (Thomson), whom the Court recognized as an expert in electrical engineering. Thomson was not permitted to visit all of the sites and was not supplied with electrical diagrams of the sites in some instances. In general, Thomson's approach in determining the electrical loads supplied by the various assets that were used by a particular category of consumptive device, and thus eligible or not eligible for the ITC to that extent, was to divide the energy consumed between the building requirements and manufacturing areas. Thomson explained in his report: an attempt has been made above to fractionize the current in a conductor (cable or bus duct), between manufacturing load and that load which is needed for the maintenance and operation of the building. Sufficient data was not provided by the representatives of Texas Instruments, in order to make an analysis of the connected loads. Because of time constraints placed on preparation of the report in conjunction with trial and the recent access to the sites, there was no time available for an independent development of the data. This lack of data on the actual connected loads precipitated *511 the above procedure of comparing the rated sizes of the circuit breakers serving the connected lines.
Thus, in some instances, Thomson concluded that he did not have sufficient data upon which to base such percentages; in other instances, he concluded that it was not possible to determine the relative percentages of electrical usages. We considered the above circumstances and that the evidence that would support the testimony of petitioner's witnesses (and discredit respondent's expert) was in petitioner's possession. Although petitioner's witnesses were generally sincere, we were not persuaded that we should give more weight to their testimony than to Thomson's testimony, particularly in light of their lack of expertise and the passage of time. Rather, given these facts and that petitioner bears the burden of proof, any doubts necessarily must be resolved against petitioner. We discuss briefly here our decision in Scott Paper Co. v. Commissioner, 74 T.C. 137 (1980), because the primary issue with respect to many of the electrical assets is whether they are "structural components". In that case, we concluded that certain of the components of the taxpayer's *512 primary electric system were section 38 property and stated that, as with other structural components, the "critical test" for the primary electrical improvements was "whether they related to the overall operation and maintenance of a building. See Central Citrus Co. v. Commissioner, 58 T.C. 365 (1972); Ponderosa Mouldings, Inc. v. Commissioner, 53 T.C. 92 (1969). The focus of such a test is on the ultimate uses of power at the facility." Scott Paper Co. v. Commissioner, supra at 183-184; fn. ref. omitted. We concluded that it was appropriate to break down the electrical load carried by the primary electric by the amount of load caused by each category of consumptive device, i.e., lighting, ventilation, air conditioning, processing machinery, etc. Although one step removed from the consumptive devices, we allowed an ITC for the primary electric improvements: To the extent that the primary electric carried electrical loads to be used for pulp and paper production processes or other such qualifying uses * * * To the extent that the primary electric improvements relate to the overall operation and maintenance of *513 buildings, they are structural components of such buildings, and they do not qualify as tangible personal property. * * * [Scott Paper Co. v. Commissioner, supra at 186.] The electrical load used by each category of consumptive device was computed by reference to circuit diagrams and electrical loads, which provided "a figurative map tracing the flow of electricity at the facility from the introduction of power by the * * * [utility company] through the primary and secondary electric to the devices that ultimately consumed the power." Id. at 148-149. Such a "logical and objective measure of electrical load" allowed this Court to allocate between the structural and processing functions that were served by the electrical components. Id. at 185; see also Morrison Inc. v. Commissioner, T.C. Memo. 1986-129, affd. 891 F.2d 857 (11th Cir. 1990). Compare A.C. Monk & Co. v. United States, 686 F.2d 1058, 1065-1066 (4th Cir. 1982). Category One
We set forth in our findings the extent to which the electrical load carried by the assets in this category was used *514 for manufacturing equipment or in qualifying manufacturing processes. These findings were based on the testimony of key employees at the respective sites and on the corroborative testimony of respondent's expert. Because they did not relate to the overall operation or maintenance of buildings, these assets are not structural components of buildings and are section 38 property to that extent. Scott Paper Co. v. Commissioner, supra at 186. See also Central Citrus Co. v. Commissioner, supra at 374 (electrical items that served primarily "specialized functions or specific equipment" qualified as section 38 property). In contrast, petitioner did not establish the extent to which the other assets in this category did not relate to the overall operation or maintenance of a building. One of those assets was the substation that was installed as part of the power distribution system for the entire Attleboro site and that also supplied power to the precious metals processing building (Building 3) and the equipment therein (asset 2038082). Petitioner relies on the testimony of Timothy Hayden (Hayden), who was in charge of the operation, maintenance, *515 and construction of the entire electrical power system at the Attleboro site, to support its contention that 95 percent of the electrical load from that substation was dedicated to manufacturing processes. Hayden estimated that the administrative offices in the precious metals processing building accounted for 5 percent of the square footage of that building. Although this testimony is relevant, as petitioner contends, in that it provides an indication of how the facility was used, we are not persuaded that it establishes conclusively the extent to which this asset carried an electrical load that was used for machinery or equipment used in qualifying manufacturing processes and did not relate to the overall operation or maintenance of the building. Further, Hayden did not begin work at that plant until 1984, and the asset was placed in service in 1981. This testimony is not sufficient for us to adopt petitioner's proposed finding that the nonmanufacturing use of this asset was only "incidental". Similarly, petitioner argues that it is entitled to the ITC on asset 973015 (Dallas), the components of which were used to power the condenser water pumps at the Dallas CUP. Petitioner *516 relied on the testimony of Edmund Groben (Groben), an industrial engineer who, from sometime in 1980 to the end of 1982, was the manager for the planning organization for the Dallas site. In that capacity, Groben was responsible for coordinating the electrical and mechanical design and for supervising construction for the layout of assembly areas in that facility. Groben did not design the utility distribution systems for those areas. Groben testified that approximately 60 to 65 percent of the output of the water chilling system was used in the cooling function and that 40 percent of the output of that system was used for air conditioning for the entire site. This testimony was based solely on Groben's review, a week before he testified, of a "written analysis" that was provided to him. That analysis, however, was not offered into evidence, and it is not clear at what time, by whom, or for what purpose that analysis was prepared. On this basis, we are unable to determine the applicable percentages and, thus, the extent to which these assets qualified as section 38 property. We therefore conclude that they are structural components within the meaning of section 1.48-1(e)(2), *517 Income Tax Regs.Scott Paper Co. v. Commissioner, 74 T.C. at 186. Also, the transformer that was installed to provide power to the extension to Module J at the N.W. Houston plant (asset 975944) related to the operation or maintenance of, and is a structural component of, that building. Category Two
Petitioner contends that the assets described in this category are section 38 property "because each was added to meet additional manufacturing needs" and therefore satisfies "the 'sole justification' test" of section 1.48-1(e)(2), Income Tax Regs., which provides, in relevant part: the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. * * * That *518 portion of the regulation does not exclude from the term "structural component" any property installed that is "essential for the operation of * * * machinery", notwithstanding that it relates to the maintenance or operation of a building, as petitioner asserts. Rather, only machinery that is required to meet the temperature and humidity requirements of other machinery is within the meaning of that portion of the regulation. See Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739, 750-753 (1985), affd. 803 F.2d 1572 (11th Cir. 1986); Morrison Inc. v. Commissioner, T.C. Memo. 1986-129, affd. 891 F.2d 857 (11th Cir. 1990). Only a few of the assets are arguably within the meaning of that portion of the cited regulation. The electrical breaker and feeder system that provided high-voltage distribution to an area within the South Building at Dallas (asset 974267) is one such asset. This system was added to increase the capacity of the existing system in response to the addition of silicon wafer fabrication facilities. Although the additional electrical load that this system carried into that building *519 was not required to provide power for maintenance or general building operations at the time it was installed, it provided incoming high-voltage power to substations within the building that stepped down and distributed that power throughout the building. Petitioner does not contend, and we could not find, that there were other areas within that building wherein machinery was required to meet temperature or humidity requirements that were essential for the operation of other machinery. Thus, petitioner has not proved that the new system served only "to an insubstantial degree, areas where such temperature or humidity requirements are not essential." Sec. 1.48-1(e)(2), Income Tax Regs.
Similarly, the high-voltage switch gear and duct bank (assets 974470 and 974471) were installed at the Lubbock plant as a redundant system to carry an electrical load to the wafer fabrication facility. Although the clean rooms therein required high power loads to maintain the environment, there were other areas within Modules F and G in that facility that were also served by the new redundant system and 30,000 of the 49,000 square feet in Module H was an administrative area. Again, there is no indication *520 that these areas, which were outside the clean rooms themselves, contained machinery that was added only "to meet temperature or humidity requirements which are essential for the operation of other machinery" and, thus, that this system provided power only to an insubstantial degree to areas where temperature or humidity requirements were not essential. Sec. 1.48-1(e)(2), Income Tax Regs. To the contrary, these assets supplied power for air-handling units, lights, vending machines, water fountains, and all other power needs of the wafer fabrication facility, except for heating and cooling, which came from the main mechanical room. They also served a 900-ton chiller that supplemented air-conditioning service to the entire Lubbock site. We therefore conclude that these assets are not within the meaning of the "sole justification test" of section 1.48-1(e)(2), Income Tax Regs. We have examined the other assets within this category and conclude that, for the same reasons set forth above, they are not within the meaning of the "sole justification test" of section 1.48-1(e)(2), Income Tax Regs.
Alternatively, petitioner contends that it has established the extent to which these assets *521 carried an electrical load to machinery and equipment used in qualifying manufacturing processes, citing Scott Paper Co. v. Commissioner, 74 T.C. 137 (1980). Thomson concluded that, in some cases, the percentage of the load used for such purposes was zero and, in other cases, no percentage was given. For the same reasons discussed above, the testimony on which petitioner relies simply does not establish the extent to which these assets carried electrical loads to be used for manufacturing or other qualifying processes. For example, petitioner offered the testimony of Hayden to support its contention that 80 to 85 percent of the electrical load carried by the main switch gear and underground high-voltage distribution system at Attleboro (assets 2038152 and 2038153) was devoted to machinery or equipment used in qualifying manufacturing processes. Hayden testified that this conclusion was not based on any "specific analysis" but rather on his "general observation" throughout the time he spent at that plant and that this allocation was "driven by square foot analyses". With respect to the switch gear and duct bank at Lubbock (assets 974470 and 974471), the witness' *522 testimony as to the power consumed at this site and consumed by the clean rooms in the wafer fabrication facility was based on an analysis that was prepared in 1981; that analysis, which was prepared by someone other than the witness, was not offered into evidence. Similarly, the witness' testimony that 75 percent of the electrical load carried by assets installed for the addition to the Systems Integration Center at Austin (assets 974885 and 974888) was devoted to machinery and equipment used in qualifying manufacturing processes in that addition was "an estimate", the basis of which was the witness' "general knowledge" or his "gut feel." This testimony is not persuasive and is not sufficiently reliable given its uncertainty and the passage of time. In any event, it is not the type of evidence that establishes a "logical and objective measure of electrical load", such as we relied upon in Scott Paper Co. v. Commissioner, supra at 185, and Morrison Inc. v. Commissioner, supra. We cannot conclude that these assets were dedicated to machinery or equipment used in qualifying manufacturing processes to the extent that petitioner asserts and, given Thomson's *523 conclusion that the percentage of the electrical load used for such purposes was zero (where given) and the record as developed, we are unable to determine any other percentage. Because we cannot determine the extent to which these assets did not "relate to the overall operation and maintenance of buildings, they are structural components of such buildings, and they do not qualify as tangible personal property." Scott Paper Co. v. Commissioner, supra at 186. Category Three
The assets in this category consist of spare circuit breakers, dual feeds, spare cable, and a rollover switch. Petitioner's position is that it is entitled to the ITC with respect to these assets because: The purpose of acquiring spares and installing redundant systems was to ensure that there was a continued source of power for critical manufacturing operations in the event of a failure. The manufacturing needs had first priority, and * * * [petitioner] would not have purchased these items but for the manufacturing demands.
Petitioner relies on Morrison Inc. v. Commissioner, T.C. Memo. 1986-129, affd. 891 F.2d 857 (11th Cir. 1990). In *524 that case, we concluded that emergency lighting was not a structural component because it performed a "special function", which was to provide ample lighting for customers to finish their meals and assurances that the taxpayers would be able to collect the amount owed by their customers in the event of a power failure, as distinguished from the lighting fixtures in the taxpayer's cafeterias, which provided "basic illumination". Petitioner argues that the assets in this category are akin to that lighting because they "served the special function of providing backup power." In each instance, until the various nondedicated spare circuit breakers and spare transformers in this case (assets 972617, 975203, 975204, 972668, 975533, 975533-1, 975533-2, 975533-3, and 974557) were actually used, it was not possible to ascertain what percentage of the load potentially carried by these spares would have related to overall maintenance and operation of buildings or to machinery or equipment used in qualifying manufacturing processes. To conclude that these nondedicated spares are nonetheless eligible for the ITC would focus on a potential use of these assets, rather than on the actual use, which *525 is the critical test. Scott Paper Co. v. Commissioner, 74 T.C. at 183-184. Under these circumstances, we conclude that these nondedicated spares are not section 38 property. Although not "fungible" in that it was purchased to replace a main feeder line at Temple, asset 974332 would have served the entire site and powered both manufacturing and nonmanufacturing areas if it had been used. Similarly, assets 2039933, 972671, 976083, and 973902 provided all the power to the respective buildings or sites, which included both manufacturing and nonmanufacturing areas, and petitioner did not establish the extent to which these assets carried electrical loads for machinery or equipment used in qualifying manufacturing processes. Thus, in addition to the reasons set forth above with respect to the nondedicated spares, we conclude that these assets are not eligible for the ITC to the extent that petitioner claims. Category Four
Petitioner relies on analyses prepared by Barbara Stevenson (Stevenson) to support its position that it is entitled to the ITC to the extent that an allocable portion of the electrical assets in this category powered machinery or equipment. *526 Respondent agrees that it is mathematically possible to apply Scott Paper Co. v. Commissioner, 74 T.C. 137 (1980), to these assets, but she disputes the validity of those analyses and argues that the percentages therein "have no credibility." Stevenson was trained as an architect and had received an MBA. She worked as an investment tax credit analyst in petitioner's tax department from 1980 until January 1984 and in petitioner's corporate services division from 1987 until the time of trial. The methodology that Stevenson employed in the analyses that she prepared for the substations at Attleboro (assets 2038231 and 2038232), which is described below, was the same that she used to determine the percentages for the other assets in this category. The analyses that were prepared for assets 973764-1, 973764-2, 973764-3, and 973764-4 (S.W. Houston), however, were not introduced into evidence. Stevenson determined that approximately 80 percent of the electrical load carried by the substations at Attleboro (assets 2038231 and 2038232) related to machinery or equipment used in qualifying manufacturing processes. The 80-percent figure reflects a cumulative or weighted *527 average of the electrical load of each of the two substations that was estimated to be dedicated to such processes. She first determined that 100 percent of Substation D served manufacturing power requirements by reviewing electrical drawings. She then determined that approximately 60 percent of Substation C served manufacturing power requirements by reviewing electrical and construction drawings and assigning a percentage to each level of the electrical system, beginning with the "lowest" level. For example, she determined that panels C-1 and XC-1, which were connected to distribution panel C, powered the lights and general building power and were not associated with manufacturing and that some of distribution panel C also served air-conditioning units. Stevenson then prepared an analysis to determine what percentage of the air-conditioning units attached to distribution panel C supported manufacturing requirements. This analysis was a "heat load" analysis based on a heat society's trade book (Asgrae), which included instructions on performing a heat load analysis. She concluded that approximately 75 percent of the air-conditioning equipment served manufacturing requirements *528 by comparing the actual cooling requirements for Building 11 with the hypothetical cooling requirements for a hypothetical administrative building with the same roof, walls, lighting, and number of people, but with a fewer number of appliances, reduced power requirements, and reduced ventilation. Because distribution panel C served both lights (which did not relate to manufacturing) and air conditioning (approximately 75 percent of which served manufacturing requirements), Stevenson assigned a cumulative or weighted average of the electrical load of approximately 43 percent to distribution panel C. This 43-percent figure was averaged with the 75-percent figure for air conditioning to derive an approximate 60-percent figure for Substation C. This 60-figure load and the 100-percent figure for Substation D were then averaged. She repeated this same process for each level of the electrical system to derive one percentage (approximately 80 percent) for the system as a whole. Petitioner treated 80 percent of the cost of each of these two substations as eligible for the credit. Thomson estimated that 80 percent of the electrical load of each of these substations was dedicated to manufacturing *529 and that the remaining 20 percent related to the operation of the building. As to assets 976010-1 and 976011-1, Thomson determined that 97 percent of the capacity of circuit panels HA and JA either served or was dedicated to serve building air-conditioning, toilet blocks, general lighting, and other electrical requirements unrelated to machinery or equipment used in manufacturing. Based on electrical diagrams that were provided to him, Thomson determined the specific use of each of the circuits on panels HA and JA of these two substations, together with the power rating for the respective circuit breakers. He also concluded that the same ratio of general building power requirements (97 percent) would apply to the transformers associated with the secondary panels of substations H and J (976012-1, 976013-1, 976022, and 976023) that applied to the substations themselves. Thomson concluded that the percentage of the electrical load carried by the other assets in this category and used in qualifying manufacturing processes was zero. Respondent contends that Stevenson inappropriately included a percentage of the electrical equipment that served air-conditioning equipment in her analysis. *530 Respondent argues that there is no support for "the proposition that all HVAC requirements over and above a hypothetical "normal building' * * * should be considered a 'manfacturing' requirements." Petitioner relies on our decision in Morrison Inc. v. Commissioner, T.C. Memo. 1986-129, affd. 891 F.2d 857 (11th Cir. 1990), to support such an allocation. We concluded in that case that the electrical load that powered an air makeup unit was included in determining the percentage of the electrical system that qualified for the ITC. We first determined, however, that that unit itself was tangible personal property and not a structural component because it was "installed only to meet temperature or humidity requirements that are essential for the operation of petitioners' other kitchen equipment. Sec. 1.48-1(e)(2), Income Tax Regs." Morrison Inc. v. Commissioner, supra.
We agree with petitioner that the record indicates that air-conditioning equipment was "necessary" for certain of its manufacturing processes, particularly in clean rooms and computer rooms. The record does not, however, indicate when the equipment that was included in the *531 HVAC analyses was installed and, as discussed above, does not support a finding that such equipment was installed solely to meet temperature or humidity requirements essential to the operation of other equipment. Further, the analysis themselves indicate that the air-conditioning equipment to which the electrical assets carried power served, to more than an insubstantial degree, areas where temperature or humidity requirements were not essential. Petitioner has not established that its air-conditioning equipment itself is section 38 property, and the inclusion in this case of the electrical loads carried to such assets is improper. Thus, we reject Stevenson's analyses and conclusions. We also examined these analyses in an attempt to ascertain whether they afforded a sufficient basis from which we could determine the extent to which these assets carried electrical loads to machinery or equipment used in qualifying manufacturing processes. In some instances, however, electrical drawings were not available or were not explained sufficiently to support Stevenson's determinations that the assets were related to or served qualifying processes. In other instances, her determinations *532 were contradicted by Thomson in his report or testimony. On the evidence in the record, we accept Thomson's conclusions as to the extent that the assets in this category carried electrical loads to machinery or equipment used in qualifying manufacturing processes, and we conclude that these assets are section 38 property only to that extent. To reflect the foregoing, Decision will be entered
under Rule 155.